**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
|  | : |  |
| **In re:  WELLBUTRIN SR** | : | **CIVIL ACTION NO. 04-5525** |
| **ANTITRUST LITIGATION** | : |  |

**PLAINTIFFS' MOTION FOR FINAL APPROVAL**
**OF DIRECT PURCHASER CLASS SETTLEMENT**

Based upon the facts and authority in their accompanying brief, Plaintiffs SAJ

Distributors, Inc., Stephen L. LaFrance Holdings, Inc., Meijer, Inc., and Meijer Distribution, Inc.

move, on behalf of themselves and the certified class of direct purchasers, for a final judgment

approving the $49 million cash settlement obtained in this case under Federal Rule of Civil

Procedure 23(e) and dismissing the case with prejudice.


Dated:  October 14, 2011                     Respectfully submitted,

                                             */s/ Joseph F. Roda*
                                             Joseph F. Roda

                                             */s/ Dianne M. Nast*
                                             Dianne M. Nast

                                             Jennifer S. Snyder
                                             RODANAST, PC
                                             801 Estelle Drive
                                             Lancaster, Pennsylvania 17601
                                             (717) 892-3000

                                             *Lead Counsel for Direct Purchaser*
                                             *Class Plaintiffs*

Michael L. Roberts
ROBERTS LAW FIRM, PA
P.O. Box 241790
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575

Arnold Levin
Fredrick S. Longer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
(215) 592-1500

J. Douglas Richards
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street
14th Floor
New York, NY 10005
(212) 838-7797

Paul E. Slater
SPERLING & SLATER, PC
55 W. Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 641-3200

Daniel E. Gustafson
Karla M. Gluek
GUSTAFSON GLUEK PLLC
650 Northstar East,
608 2nd Avenue S.
Minneapolis, MN 55402
(612) 333-8844

Linda P. Nussbaum
Shelly Friedland
John D. Radice
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
(646) 722-8500

Daniel Berger
Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3026

Joseph M. Vanek
VANEK, VICKERS, & MASINI P.C.
111 S. Wacker, Suite 4050
Chicago, Illinois 60606
(312) 224-1500

*Co-Counsel for Direct Purchaser Class Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
|  | : |  |
| In re:  WELLBUTRIN SR | : | CIVIL ACTION NO. 04-5525 |
| ANTITRUST LITIGATION | : |  |

**MEMORANDUM IN SUPPORT OF**
**PLAINTIFFS' MOTION FOR FINAL APPROVAL**
**OF DIRECT PURCHASER CLASS SETTLEMENT**

**INTRODUCTION**

SAJ Distributors, Inc. and Stephen L. LaFrance Holdings, Inc. (together, "SAJ") and

Meijer, Inc. and Meijer Distribution, Inc. (together, "Meijer") (collectively, "Plaintiffs"), submit

this memorandum, on behalf of themselves and the certified class of direct purchasers ("the

class"),[1] in support of their motion for final approval under Federal Rule of Civil Procedure 23(e)

of the $49 million cash settlement they have obtained in this case.

For the reasons below, the proposed settlement is in all respects fair, reasonable, and

adequate, is an excellent benefit to the class, and meets all other criteria supporting final

approval.  The notice provided to the class satisfies all requirements of the Court's August 31,

2011 order granting preliminary approval of the settlement [Doc. 407] (hereinafter "Preliminary

Approval Order"), and the plan to allocate proceeds to class members is—like the settlement—

fair, reasonable, and adequate.

Plaintiffs therefore respectfully request that this Court enter an order granting final

approval of the settlement and dismissing the case with prejudice.

---

[1]  *See In Wellbutrin SR Antitrust Litig.,* Memorandum and Order (Doc. 258) (E.D. Pa.
May 2, 2008) (Kauffman, J.), certifying the following class:  "all persons or entities in the United
States, excluding governmental entities, that purchased the 100mg or 150mg dosage of
Wellbutrin SR directly from GSK during the period from January 24, 2002 to June 30, 2006."

## BACKGROUND

**I.      The Litigation**

Plaintiffs filed this class action lawsuit in 2004, alleging that Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK") violated Section 2 of the Sherman Act, 15 U.S.C. § 2, by unlawfully extending its monopoly over Wellbutrin SR, a brand name prescription antidepressant that GSK manufactures and markets.

Specifically, Plaintiffs' complaint alleged that GSK had filed sham litigation against manufacturers of generic forms of Wellbutrin SR, baselessly asserting that those manufacturers had infringed GSK's '798 and '994 patents, to prevent those competitors from bringing their generic products to market.  Plaintiffs also asserted a *Walker Process* claim, alleging that GSK had obtained one of these patents (the '994 patent) through fraud on the United States Patent and Trademark Office.  Plaintiffs claimed that, as a result of GSK's sham litigation and *Walker Process* fraud, they and other members of the direct purchaser class paid more for Wellbutrin SR than they would have in the absence of GSK's alleged anticompetitive conduct.

During the nearly seven years that this case was pending between filing (which followed an extensive pre-suit investigation) and settlement, the parties engaged in comprehensive motion practice, discovery, and development of the legal and substantive issues.  Plaintiffs vigorously pursued the case, and GSK defended it with equal force.  During the course of the case:

- Plaintiffs successfully opposed GSK's motion to dismiss and attempts to obtain interlocutory appeal of that decision;

- Plaintiffs obtained certification of the class over GSK's opposition;

- the parties actively pursued formal and informal discovery, including GSK's production of more than one million pages of documents, which Plaintiffs

analyzed and prepared for future use in the litigation;

- the parties collectively took and/or defended roughly thirty depositions throughout the country;

- the parties sought and obtained discovery from the third-party manufacturers of generic versions of Wellbutrin SR;

- the parties retained and consulted numerous experts to conduct preliminary evaluations, prepare reports in connection with class certification, and then prepare initial and supplemental reports on liability and damages;

- the parties briefed and argued numerous discovery motions on a variety of issues, including the attorney-client privilege, the work product doctrine, motions for protective orders, and motions to compel;

- GSK initially filed two motions for summary judgment, one of which Plaintiffs successfully opposed, and the other of which (on Plaintiffs' *Walker Process* fraud claim) GSK won;

- GSK then filed a renewed motion for summary judgment (on the motion on which Plaintiffs had initially succeeded), which had been argued and was pending at the time of settlement;

- the parties briefed more than twenty pre-trial motions, including motions *in limine*, *Daubert* motions, and a motion to bifurcate the trial, many of which were argued to the Court, and several of which the Court had decided;

- the parties prepared and exchanged pretrial materials—including witness and exhibit lists, proposed stipulations, and deposition designations and counter-designations; and

3

- the parties filed pretrial memoranda and proposed jury instructions and verdict slips with the Court.

The legal issues that the parties debated throughout the case were not only many in number, but also complex and difficult.  Central to the case were complicated and often confusing patent law doctrines—including the doctrines of equivalents, prosecution history estoppel, and clear and unmistakable surrender—a fact that this Court knows well from the multiple summary judgment filings and many motions *in limine* involving these issues.  Key to the difficulty of these issues was the fact that GSK had filed its underlying patent infringement lawsuits against the generic manufacturers when these legal theories were being parsed and refined by the Federal Circuit Court of Appeals and Supreme Court, which sometimes differed in their interpretations.

Moreover, because this case centers on prior litigation and conduct in which GSK's counsel were significantly involved, GSK withheld thousands of documents from discovery based on claims under the attorney-client privilege and work product doctrine.  GSK's privilege claims, which themselves were hotly contested, forced Plaintiffs to pursue the case with a vast amount of the relevant evidence off limits.

Only on the eve of trial, after many years of hard-fought litigation, did Plaintiffs and GSK reach a settlement.

## II.    Brief Summary of the Class Action Settlement

After the Court issued its January 4, 2011 order scheduling this case for trial, and with the Court's encouragement, the parties explored the possibility of settlement in a private, day-long mediation session held on April 1, 2011 with Boston University Law School Professor Eric D. Green, a well-recognized and accomplished mediator.  *See In re Am. Investors Life Ins. Co.*

4

*Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 230 (E.D. Pa. 2009) (McLaughlin, J.) (acknowledging Professor Green's experience).  The parties were unsuccessful in reaching a resolution that day and continued their preparation for trial, which was set to begin on June 27, 2011.

After a hearing before the Court on May 25, 2011, during which the parties argued GSK's renewed motion for summary judgment and various pre-trial motions, the parties agreed, at the Court's urging, to return to private mediation.  The parties did so on June 7, 2011, again with Professor Green, and they succeeded that day in reaching a settlement.  The settlement was memorialized that day in a memorandum of principle, and then in the Settlement Agreement, which was executed on August 3, 2011, filed with the Court on August 17, 2011, and preliminary approved by the Court on August 31, 2011.

The settlement will resolve all claims that have been or could have been asserted in this case concerning the alleged suppression of generic competition for Wellbutrin SR, for all direct purchasers of Wellbutrin SR and its generic equivalents during the period January 24, 2002 to June 30, 2006.

Specifically, the Settlement Agreement provides for:

- a national, class-wide settlement;
- the payment by GSK of $49 million in cash (less taxes and attorneys' fees, costs, and class representative awards that this Court may grant) to class members who file timely claim forms;
- the additional payment by GSK of up to $500,000 towards the cost of notice to the class and administration of the settlement; and
- individual notice to each class member by first class mail and summary notice by

publication.[2]

In light of the risks and costs that trial and appeal of this case presented, the settlement is an excellent result that provides real benefit to the class.

## III.    Notice to the Class

Consistent with the Court's Preliminary Approval Order (at ¶¶ 3-5), notice was provided to the class via three methods.  First, individual notice was sent to class members by first class mail on about September 21, 2011.  *See* Exhibit 1, Verification of Class Notice Mailing.  The notice advised class members of the settlement and their associated legal rights, including the rights to submit a claim, to attend and be heard at the final fairness hearing, and to object to any term of the settlement, the petition for attorneys' fees and costs, or the proposed awards to the class representatives for their efforts in pursuing this case on behalf of the class.  The notice also informed class members how they could obtain additional details about the settlement.

Second, notice was published in summary form in two issues (dated September 26, 2011 and October 3, 2011) of the *Pink Sheet,* a pharmaceutical industry publication likely to be seen by class members.  *See* Exhibit 2, Certificate of Published Notice / Website.  The summary notice informed class members of critical deadlines and how they could obtain more detailed notice and other information about the settlement.

Third, a website ([www.WellbutrinDirectPurchaserSettlement.com](http://www.WellbutrinDirectPurchaserSettlement.com)) was established, which contains the notice, claim form, Settlement Agreement, and the Court's Preliminary

---

[2]   Additionally, the Settlement Agreement permits counsel for the class to seek reimbursement of costs advanced on behalf of the class, attorneys' fees not to exceed one-third of the $49 million settlement fund, and awards of $25,000 each to Plaintiffs SAJ and Meijer for their efforts and work as class representatives.  These payments, if approved, would be deducted from the $49 million settlement fund.  A detailed explanation of the requested fees, reimbursement of advanced expenses, and class representative awards is set forth in Plaintiffs' Motion for Attorneys' Fees, Reimbursement of Expenses, and Class Representative Awards and supporting memorandum, which are being separately filed.

Approval Order, and clearly instructs class members how they can obtain additional information. *See* Exhibit 2.

## ARGUMENT

I.     **Final Approval of the Settlement is Appropriate.**

    A.     **The Settlement is Fair, Reasonable, and Adequate.**

The "strong presumption" that generally exists in favor of voluntary settlements is especially marked in the context of class action cases. *Ehrheart v. Verizon Wireless*, 609 F.3d 590, 594-95 (3d Cir. 2010). There is an overriding public interest in settling such cases, *see In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004), as settlements "promote the amicable resolution of disputes[,] . . . lighten the increasing load of litigation faced by the federal courts[,]" and frequently enable parties to "gain significantly from avoiding the costs and risks of a lengthy and complex trial." *Ehrheart*, F.3d 609 at 595.

A class action settlement warrants final approval if it is "fair, reasonable, and adequate." Fed. R. Civ. P. 23(e)(2); *In re Ins. Brokerage Antitrust Litig.*, 579 F.3d 241, 258 (3d Cir. 2009) (citations omitted). The Third Circuit has held that an initial presumption of fairness applies when a district court finds that the factors have been met to support a settlement's preliminary approval. *In re Cendant Corp. Litig.*, 264 F.3d 201, 232 n.18 (3d Cir. 2001). As noted above, the Court has made such a determination here, having preliminarily approved the settlement by its order of August 31, 2011.

To further guide courts in assessing whether a settlement warrants final approval, the Third Circuit has identified nine factors (often called the *Girsh* factors) to consider:

        (1) the complexity, expense and likely duration of the litigation;
        (2) the reaction of the class to the settlement; (3) the stage of the
        proceedings and the amount of discovery completed; (4) the risks
        of establishing liability; (5) the risks of establishing damages; (6)

> the risks of maintaining the class action through the trial; (7) the
> ability of the defendants to withstand a greater judgment; (8) the
> range of reasonableness of the settlement fund in light of the best
> possible recovery; (9) the range of reasonableness of the settlement
> fund to a possible recovery in light of all the attendant risks of
> litigation.

*Ins. Brokerage Antitrust Litig.*, 579 F.3d at 258 (citing *Girsh v. Jepson*, 521 F.2d 153, 157 (3d Cir. 1975)).  No one factor by itself is dispositive.  *Hall v. Best Buy Co., Inc.*, 274 F.R.D. 154, 169 (E.D. Pa. 2011) (Rufe, J.).

In addition to the *Girsh* factors, the Third Circuit has more recently held that district courts should also consider an additional set of factors (known as the *Prudential* factors), which include:

- the maturity of the underlying substantive issues, as measured by experience in adjudicating individual actions, the development of scientific knowledge, the extent of discovery on the merits, and other factors that bear on the ability to assess the probable outcome of a trial on the merits of liability and individual damages;

- the existence and probable outcome of claims by other classes and subclasses;

- the comparison between the results achieved by the settlement for individual class or subclass members and the results achieved—or likely to be achieved—for other claimants;

- whether class or subclass members are accorded the right to opt out of the settlement;

- whether any provisions for attorneys' fees are reasonable; and

- whether the procedure for processing individual claims under the settlement is fair and reasonable.

*In re Pet Food Products Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010) (citing *In re Prudential*

*Ins. Co. Am. Sales Practice Litig. Agent Actions*, 148 F.3d 283, 323 (3d Cir. 1998)).  Only those

*Prudential* factors that are relevant to the litigation in question need be addressed.  *Prudential,*

148 F.3d at 323-24.[3]

  District courts must make findings on each of the *Girsh* factors and, where appropriate,

the *Prudential* factors, and may not simply substitute assurances from or conclusions by the

parties for independent analysis of the settlement.  *Pet Food,* 629 F.3d at 350.[4]  "[T]he

professional judgment of counsel involved in the litigation" is, however, "entitled to significant

weight."  *Fisher Bros. v. Phelps Dodge Indus., Inc.*, 604 F. Supp. 446, 452 (E.D. Pa. 1985)

(Shapiro, J.).  Counsel should not be held to "an impossible standard, as a settlement is virtually

always a compromise, a yielding of the highest hopes in exchange for certainty and resolution."

---

[3]  At least one court has suggested that where the *Girsh* factors clearly establish the
fairness, reasonableness, and adequacy of a settlement, consideration of additional factors is not
necessary.  *Pichler v. UNITE*, 775 F. Supp. 2d 754, 758 (E.D. Pa. 2011) (Dalzell, J.).  In the
interest of completeness, Plaintiffs address the *Prudential* factors, in addition to the *Girsh*
factors, although some of the *Prudential* factors (as noted below) are not particularly relevant in
the context of this case.

[4]  The proposed order submitted herewith addresses both this motion and Class Counsel's
Motion for Attorneys' Fees, Reimbursement of Expenses, and Class Representative Awards.  A
combined order has been submitted both for efficiency (as the motions and relevant legal
standards involve overlapping issues) and consistent with the Settlement Agreement (previously
submitted as Exhibit 1 to Plaintiffs' Motion for Preliminary Approval of Direct Purchaser Class
Settlement), which requires (at ¶ 4) that Plaintiffs seek "an" order and final judgment containing
certain terms, some of which concern final approval and others of which concern attorneys' fees,
reimbursement of costs, and awards to the class representative Plaintiffs.

   The proposed order contains detailed findings and case law citations in recognition of the
requirement that district courts must make findings on each of the relevant factors pertinent to
these motions.  *See Pet Food*, 629 F.3d at 350; *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 301
(3d Cir. 2005) ("Notwithstanding our deferential standard of review of fee determinations, we
have required district courts to clearly set forth their reasoning for fee awards so that we will
have a sufficient basis to review for abuse of discretion.").  It is not, however, the intention of
Plaintiffs or Class Counsel to substitute their conclusions for the independent analysis of the
Court or to otherwise intrude on the province of the Court.

*In re Ikon Office Solutions, Inc., Sec. Litig.*, 194 F.R.D. 166, 179 (E.D. Pa. 2000) (Katz, J.) (citations, internal quotations omitted).

Approval of a proposed class action settlement is within the discretion of the district court and will not be overturned on appeal absent a clear abuse of discretion.  *Prudential*, 148 F.3d at 299.  Given its familiarity with the parties and the nuances of the litigation, a district court's factual findings are accorded substantial weight.  *Id.* at 317.

The present settlement meets each of the relevant factors for final approval.

### The *Girsh* Factors

**1.**      **The complexity, expense, and likely duration of the litigation.**

Antitrust class actions are "'arguably the most complex action[s] to prosecute' as '[t]he legal and factual issues involved are always numerous and uncertain in outcome.'"  *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, Civ. A. 03-4578, 2005 WL 1213926, at *11 (E.D. Pa. May 19, 2005) (Padova, J.) (quoting *In re Linerboard Antitrust Litig.,* 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (DuBois, J.)).  This case was no exception.

While much had been done in the case when it settled, much still remained to be done, and the settlement thus saved substantial time and expense.  Specifically, it saved further oral argument on the several motions that were still pending, but not yet argued, and if the pretrial motions or GSK's motion for reconsideration of summary judgment had not ended the case, final pretrial preparations, trial, post-trial motions, and appeals.  These matters would have collectively required, without question, substantial time and expense for the Court, the parties, and counsel.   Settlements that save such time and expenses are favored, and this factor thus supports final approval.  *See Warfarin*, 391 F.3d at 536; *Meijer, Inc. v. 3M*, Civ. A. 04-5871, 2006 WL 2382718, at *13 (E.D. Pa. Aug. 14, 2006) (Padova, J.).

### 2.      The reaction of the class to the settlement.

To date, there have not been any objections to the settlement.  The class members in this case are sophisticated businesses with very large potential claims, and when few or no objections come from such a class, the Third Circuit has held that this is "particularly telling."  *Warfarin*, 391 F.3d at 536.  *See also Cendant*, 264 F.3d at 235 ("The vast disparity between the number of potential class members who received notice of the Settlement and the number of objectors creates a strong presumption that this factor weighs in favor of the Settlement[.]"); *In re Linerboard Antitrust Litig.*, 321 F. Supp. 2d 619, 629 (E.D. Pa. 2004) (DuBois, J.) (holding that the absence of any objections from class members, which were large, sophisticated corporations, "strongly militates a finding that the settlement is fair and reasonable").[5]

Moreover, the three largest pharmaceutical distributors in the country—class members whose claims (including those of their subsidiaries) collectively represent the vast majority (roughly 78%) of the total recovery, and who thus have the greatest stake in the case—have all submitted letters supporting the settlement.  *See* Exhibits 3-5 (letter of October 3, 2011 from McKesson Corporation, letter of September 27, 2011 from counsel for AmerisourceBergen Co., and letter of September 27, 2011 from counsel for Cardinal Health).[6]  These letters explain that these three companies will make the largest claims for recovery from the settlement in this case, and that each company—having been informed of the facts, circumstances, legal hurdles, and other risks involved in this case—supports the proposed settlement as fair and adequate.  *See*

---

[5]  Under the Court's Preliminary Approval Order, objections must be postmarked no later than November 4, 2011.  If any objections are received after the filing of this memorandum, Plaintiffs will provide an update to the Court and submit responses to those objections by the established deadline of November 14, 2011 (assuming that such objections, if any, are timely submitted).

[6]  Although each of these letters is addressed to the Court, the letters were provided to Class Counsel for filing with this Memorandum and were not separately mailed to the Court.

Exhibits 3-5.  This further supports the settlement, and the conclusion that it is in the best interests of the class.

### 3. The stage of the proceedings and the amount of discovery completed.

The procedural stage of a case at the time of settlement is a lens through which the Court can assess whether counsel adequately appreciated the merits of the case before negotiating that settlement.  *Warfarin*, 391 F.3d at 537 (citations omitted).  "[C]ourts generally recognize that a proposed class action settlement is presumptively valid where . . . the parties engaged in arm's length negotiations after meaningful discovery."  *Cullen v. Whitman Med. Corp.*, 197 F.R.D. 136, 144-45 (E.D. Pa. 2000) (Brody, J.).  *See also Linerboard,* 321 F. Supp. 2d at 630.

Settlements reached after discovery "are more likely to reflect the true value of the claim and be fair."  *Bell Atlantic Corp. v. Bolger,* 2 F.3d 1304, 1314 (3d Cir. 1993).  The settlement in this case was reached after discovery; indeed, as discussed in detail above, it was reached as the case approached its *seventh* year of hard-fought litigation (not including pre-suit investigation), and was on the eve of trial.  With the case in that posture, there can be little doubt that counsel fully appreciated its merits and risks.

Having handled this case from its initiation through each of the events described above, and having had past experience with other similar kinds of cases, the attorneys involved knew the case inside and out, and were thus in an excellent position to participate in meaningful settlement negotiations.  *See Prudential,* 148 F.3d at 319 (explaining that the inquiry into the type and amount of discovery the parties have undertaken aims to ensure that a proposed settlement is the product of "informed negotiations").

Indeed, the Third Circuit has found this factor satisfied in settlements reached at far earlier procedural stages than the present case was in when settlement was reached.  *See, e.g.,*

*Cendant*, 264 F.3d at 236 (settlement approved even though it was reached early in the case, with discovery itself in its nascent stages).

This factor thus also supports final approval.

### 4.      The risks of establishing liability.

This factor (like that which follows) weighs the likelihood of ultimate success against the benefits of an immediate settlement, with the existence of bars to the plaintiffs' success at trial weighing in favor of settlement.  *Warfarin*, 391 F.3d at 537; *Prudential,* 148 F.3d at 319.

To prevail at trial in this case, Plaintiffs would have had to establish—by clear and convincing evidence—that GSK's patent infringement lawsuits against generic drug manufacturers Eon and Impax concerning GSK's '798 patent were both (1) objectively baseless, in the sense that no reasonable litigant in GSK's position could realistically have expected to prevail on the merits, and (2) filed with the intent to delay the introduction of generic Wellbutrin SR to the marketplace.  *See Prof'l Real Estate Investors v. Columbia Pictures Indus. Inc.*, 508 U.S. 49, 60-61 (1993) ("*PRE*").

Proving these liability elements—especially under the heightened evidentiary standard that Plaintiffs had to meet—would have been anything but a sure bet.  As noted above, the challenge for Plaintiffs was even greater because GSK had blocked, under claims of attorney-client privilege and/or work product, thousands of documents relevant to these elements.  As a result, Plaintiffs would have had to rely on circumstantial evidence and independent analysis of the legal issues involved in the underlying infringement lawsuits.

As to the latter, and as also noted above, the complexity of the legal issues in this case was compounded by the fact that many of the patent doctrines involved in GSK's lawsuits against the generic manufacturers were being interpreted and refined by the Federal Circuit

Court of Appeals and Supreme Court as GSK's lawsuits were being filed and pursued.  While

Plaintiffs maintain that the law neither supported GSK's position from the start nor could

realistically have been expected to develop in ways that would have inured to GSK's benefit,

these issues were nonetheless hotly contested by GSK and not ones that Plaintiffs were

guaranteed to win.  At a minimum, the changing legal landscape further complicated an already

complex case, and with increased complication, there is always enhanced risk.

 In addition, even if plaintiffs would have succeeded in proving both of the *PRE*

elements, Plaintiffs would also have had to establish each of the standard elements of antitrust

liability, including monopoly power, causation, and antitrust injury.  Each hurdle that Plaintiffs

had to overcome presented another risk.  Were GSK to break just one link in the chain of

elements that Plaintiffs had to prove, Plaintiffs would not have made their case.

As the Court can attest, GSK had filed several motions aimed at accomplishing just that,

most of which—including GSK's renewed motion for reconsideration of summary judgment,

multiple *Daubert* motions to exclude the testimony of several of Plaintiffs' experts, and multiple

motions *in limine*—were pending at the time of settlement.  Unfavorable rulings on any of these

motions would have caused a setback in Plaintiffs' case at a minimum, if not ended it altogether.

Had Plaintiffs prevailed on each of these outstanding motions, they still would have faced

the additional risk that a jury might not find in their favor at trial.  Related to this was another of

GSK's pending motions, which sought to bifurcate the trial to address the issue of monopoly

power first.  Had the Court granted that motion, this would not have ended Plaintiffs' case, but it

would have forced Plaintiffs to present their case to the jury both in a sequence contrary to their

choosing and without the benefit of presenting all of the relevant evidence in a single phase of

trial.

Beyond this, and particularly given the number of novel issues in the case, Plaintiffs would have faced the risk that a jury verdict or the Court rulings on certain legal issues in their favor might have been overturned on appeal.

In short, although the amount of the settlement may cast some doubt on GSK's defenses to liability, the risks that Plaintiffs faced were both multifold and formidable, and this factor, too, weighs in favor of settlement.  *See In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 490 (E.D. Pa. 2003) (Brody, J.) (where the defendants vigorously denied wrongdoing, the plaintiffs faced considerable risk in establishing liability and damages, and the prospect of appeals threatened to prolong the case for years, this weighed in favor of approving settlement).

### 5. The risks of establishing damages.

Plaintiffs' expert economist, Gary French, Ph.D., developed a damages model that took into account various factors relevant to the case, including assumptions about the "but-for" world (i.e., what would have occurred in the absence of GSK's infringement lawsuits), such as which manufacturers of generic Wellbutrin SR would have entered the market on which strengths and when.  While Dr. French based his damages model largely by extrapolating "real world" facts to apply at earlier points in time (i.e., presuming the absence of GSK's infringement lawsuits against Eon and Impax), his damages model necessarily involved some amount of speculation. To account for some of the uncertainties, Dr. French's damages model contemplated alternative scenarios (e.g., two versus three generic entrants and differing dates of generic entry).  While Plaintiffs believe that Dr. French's opinion was on solid ground, and well with the bounds of *Daubert*, GSK disagreed, and filed a motion seeking to exclude Dr. French's testimony, which was still pending at the time of settlement and thus presented an additional risk to Plaintiffs.

GSK also presented its own expert, Margaret Guerin-Calvert, whose analysis proposed far lower damages figures.  Thus, even assuming that GSK would not have prevailed on its *Daubert* motion seeking to exclude Dr. French, Plaintiffs would have faced the risk that the jury might have accepted GSK's expert's theories over those of Dr. French.

The Third Circuit has recognized that competing expert opinions on complex damage issues weighs in favor of settlement.  *Cendant*, 264 F.3d at 239.  *See also Corel Corp.,* 293 F. Supp. 2d at 492 (observing that where it was impossible to predict how a jury would respond to the parties' experts' conflicting damages theories, this weighed in favor of approving settlement).

### 6.        The risks of maintaining the class action through the trial.

Although a district court may decertify or modify a class action at any time if it proves to be unmanageable, *see Warfarin*, 391 F.3d at 537, there were no manageability problems at the time of settlement nor was there any pending motion to decertify the class.  On balance, this factor, which measures the likelihood of maintaining a certified class throughout trial, *see id.*, is thus neutral in this case.  *See Cendant,* 264 F.3d at 239 (holding that this factor was neutral where the risk of decertification appeared to be extremely slight); *Linerboard*, 321 F. Supp. 2d at 631 (holding that this factor did not counsel either in favor of or against approval where no particular risk of decertification had been identified).

### 7.        The ability of the defendants to withstand a greater judgment.

This factor has been found to be perhaps most relevant in cases—unlike the present one—in which a settlement is less than might ordinarily be awarded, but the defendant's financial circumstances do not permit settlement in a greater amount.  *Reibstein v. Rite Aid Corp.*, 761 F. Supp. 2d 241, 254 (E.D. Pa. 2011) (Robreno, J.); *Chakejian v. Equifax Info. Services, LLC*, 275 F.R.D. 201, 214 (E.D. Pa. 2011) (Brody, J.).

16

It has also been recognized that whether the defendant would have had the resources to pay more in settlement is not relevant where considered only in a vacuum, divorced from considerations of whether the settlement is fair in light of the legal issues and circumstances involved in the case. *See Warfarin*, 391 F.3d at 538. This case involved many difficult legal issues, presented substantial risks that Plaintiffs would either not prevail or would be required to spend substantial additional time and expenses pursuing the case to its ultimate end, and the settlement negotiations, as with the case generally, were hard-fought by GSK. The amount that Plaintiffs obtained in settlement is an excellent benefit on its face, and an even better result when these considerations are taken into account. The theoretical ability of GSK to pay more, considered absent this context, is not relevant to determining the reasonableness of this settlement. *See id.*

> **8.** **The range of reasonableness of the settlement fund in light of the best possible recovery and all the attendant risks of litigation.**

In combination, the final two *Girsh* factors assesses "whether the settlement represents a good value for a weak case or a poor value for a strong case." *Warfarin*, 391 F.3d at 538. They "test two sides of the same coin: reasonableness in light of the best possible recovery and reasonableness in light of the risks the parties would face if the case went to trial." *Id.* (citation omitted).

Assessment of a settlement, however, need not be tied to an exact formula. *See Prudential,* 148 F.3d at 322. The Third Circuit has cautioned against demands that a settlement approach the maximum possible recovery, noting that a settlement is, after all, a compromise. *Id.* at 316-17. Accordingly, a settlement may still be within a reasonable range, even though it represents only a fraction of the potential recovery. *Cullen*, 197 F.R.D. at 144; *Linerboard*, 321 F. Supp. 2d at 632. *See also Fisher Bros.*, 604 F. Supp. at 451 ("The court must review a

settlement to determine whether it falls within a 'range of reasonableness,' not whether it is the most favorable possible result of litigation.").

Plaintiffs' damages expert, Dr. French, estimated Plaintiffs' single (i.e., non-trebled) damages to range between approximately $457 million and $839 million.  The $49 million settlement fund thus represents a recovery of between 5.8% and 10.7% of Plaintiffs' estimated, non-trebled damages, which is the measure by which courts have generally assessed antitrust settlements.  *See Fisher Bros.*, 604 F. Supp. at 451.

This amount is well within the range of recovery demonstrated by court-approved settlements in other antitrust litigation.  *See, e.g., Linerboard,* 296 F. Supp. 2d at 581 (collecting antitrust settlements ranging from 5.35% to 28% of estimated damages); *Stop & Shop*, 2005 WL 1213926, at *9 (approving direct purchaser antitrust settlement representing approximately 11.4% of estimated damages).  This factor thus also supports final approval.

### The *Prudential* Factors

**9.      Factors that bear on the maturity of the underlying substantive issues.**

As discussed above, this case was settled only after years of litigation and the completion of full-blown discovery, just before trial and after hard-fought settlement negotiations.  That the underlying substantive issues were so well-developed further supports approval of this settlement.  *See Chakejian,* 2011 WL 2411109, at *12 (finding that where the underlying substantive issues were "mature in light of the experience of the attorneys, extent of discovery, posture of the case, and mediation efforts undertaken," this factor supported approval of the settlement).

**10.  The existence and probable outcome of claims by other classes and subclasses.**

While antitrust claims are also being pursued by other plaintiffs, they are indirect purchasers, whose standing differs from that of the direct purchasers. No direct purchaser plaintiffs have opted out of the class, and there thus are no comparable claims being pursued by other direct purchaser classes or subclasses. This factor is thus not pertinent.

**11.  Results achieved by settlement for individual class members versus the results achieved—or likely to be achieved—for other claimants.**

As noted above, there are no other direct purchaser actions pending, and there are thus no other claimants whose results might be compared against those of the individual class members. (As described below, individual class members' claims will be allocated in proportion to their injuries, and a comparison of individual class members claims thus demonstrates equitable treatment.)

**12.  Whether class or subclass members are accorded the right to opt out of the settlement.**

As this Court recognized in its Preliminary Approval Order (at ¶ 2), class members were given the opportunity to opt out of the class in 2008, when they were notified that the class had been certified. Notably, despite ample opportunity, no class member requested exclusion from the class by the September 12, 2008 deadline. *See id.* This factor thus also supports final approval.

**13.  Whether any provisions for attorneys' fees are reasonable.**

On this point, Plaintiffs incorporate by reference their Motion for Attorneys' Fees, Reimbursement of Expenses, and Class Representative Awards and supporting memorandum, which are being separately filed. For the reasons set forth therein, the attorneys' fees and costs

sought by counsel are within accepted ranges and reasonable, particularly given the advanced

stage of these proceedings.

> **14.    Whether the procedure for processing individual claims under the
> settlement is fair and reasonable.**

Each notice that was individually mailed to class members included a claim form (with

clear and easily comprehensible instructions), which was approved by this Court in its

Preliminary Approval Order (at ¶ 3).  *See* Exhibit 1.  In addition, the summary notice published

twice in the *Pink Sheet* gave class members a variety of options to obtain detailed notice,

including the claim form and instructions, and the notice, claim form, and other materials have

also been made (and continue to be) available on the website dedicated to this settlement

(www.WellbutrinDirectPurchaserSettlement.com).  *See* Exhibit 2.

In accordance with the Court's Preliminary Approval Order (at ¶ 11), class members may

submit claims until the postmark deadline of December 31, 2011.  The Court has authorized

Class Action Administration, Inc. ("CAA"), which is experienced in administering class action

settlements and was previously appointed by the Court as class administrator, to receive and

process class members' claims, with the supervision of counsel for the class.  *See id.* at ¶ 6.

After all timely claims have been processed, claims payments will be distributed to class

members from the Net Settlement Fund[7] on a *pro rata* basis, according to class members'

purchases of Wellbutrin SR during the class period.  The plan of allocation thus does not grant

preferential treatment to any class member.  The procedure for processing individual claims

under the settlement is thus fair and reasonable.  In further support of this point, Plaintiffs

---

[7]  As defined in the Settlement Agreement, the Net Settlement Fund is the amount
remaining in the settlement fund for distribution for approved claims after reduction for payment
of taxes, attorneys' fees, any awards to the class representatives and disbursements for such costs
and expenses as approved by the Court.

incorporate their discussions of the notice and plan of allocation, below.

**B.      Adequate Notice Was Provided to the Class Consistent With the Court's Order Preliminarily Approving the Settlement.**

The due process requirements of the Fifth Amendment and the Federal Rules of Civil Procedure require that adequate notice of a proposed settlement be given to class members. *Nichols v. SmithKline Beecham Corp.*, Civ. A. 00-6222, 2005 WL 950616, at *9 (E.D. Pa. Apr. 22, 2005) (Padova, J.); Fed. R. Civ. P. 23(e).  "The Rule 23(e) notice is designed to summarize the litigation and the settlement and to apprise class members of the right and opportunity to inspect the complete settlement documents, papers, and pleadings filed in the litigation." *Prudential*, 148 F.3d at 326-27 (citation, internal quotation marks omitted).  The Fifth Amendment's due process requirements are satisfied by the "combination of reasonable notice, the opportunity to be heard and the opportunity to withdraw from the class."  *Id.* at 306.

As described above, individual notice of the settlement was provided by first class mail, summary notice was published twice in a pharmaceutical-industry journal, and notice (along with other information) was made (and remains) available on a website, all consistent with this Court's August 31, 2011 Preliminary Approval Order.  The Third Circuit has repeatedly held notice to be sufficient where both individual and publication notice are provided.  *See, e.g., Prudential*, 148 F.3d at 327-28; *Zimmer Paper Prods., Inc. v. Berger & Montague, P.C.*, 758 F.2d 86, 90 (3d Cir. 1985).

The content of the notice is also sufficiently clear, detailed, and instructive to satisfy due process.  The notice informs class members of the claims involved in this case, the terms of the settlement, the definition of the class and class period, how to submit a claim form and the deadline for doing so, the date and location of the final fairness hearing, the opportunity to attend and speak at the hearing, the opportunity to object, the role of class counsel, and how to obtain

additional information.  *See Prudential,* 148 F.3d at 328 (approving class notice where it

explained the nature of the claims, the settlement, the available relief, class members' rights and

options, and how to obtain more detailed information); *Nichols*, 2005 WL 950616, at *9

(observing that Rule 23(e) requires that notice inform class members of the nature of the

litigation and the settlement's general terms, that complete information is available from court

files, and that any class member may appear and be heard at the final fairness hearing).  The

summary notice, while less detailed, instructs class members of critical deadlines and how they

may obtain more detailed notice and other information.

> While the settlement notice does not provide class members with a second opportunity to

opt out, this Court has already held that there is no need for another opt-out period, given that the

opportunity to opt out that was provided in 2008 (in connection with notice of class certification)

fully complied with Rule 23's requirements.[8]

### C.     The Plan of Allocation is Fair, Reasonable, and Adequate.

> "Approval of a plan of allocation of a settlement fund in a class action is governed by the

same standards of review applicable to approval of the settlement as a whole:  the distribution

plan must be fair, reasonable and adequate."  *Ikon Office Solutions,* 194 F.R.D. at 184 (citation,

internal quotation marks omitted).  Generally, an allocation plan is reasonable if it reimburses

class members based on the type and extent of their injuries.  *Id.* (citation omitted).

> As described above, claims payments will be distributed to class members from the Net

Settlement Fund on a *pro rata* basis, according their purchases of Wellbutrin SR during the class

period.  The plan of allocation thus does not grant special treatment to any class member,

---

[8]   This Court's holding is consistent with those in many other cases in which a second opt-out period was not required.  *See* Memorandum in Support of Plaintiffs' Motion for Preliminary Approval of Direct Purchaser Class Settlement (Doc. 405), at 15-17.

reimburses class members in proportion to the damages incurred by each, and is thus, fair, reasonable, and adequate. *See, e.g., Fisher Bros.*, 604 F. Supp. at 451 (E.D. Pa. 1985) (approving of plan of allocation as both "fair" and "easy to administer" where it was proposed that the settlement fund be distributed to class members in proportion to their purchases of copper water tubing from the defendants during the class period); *Meijer*, 2006 WL 2382718, at *17 (approving allocation plan in an antitrust case based on class members' direct purchases and thus relative injuries).

## CONCLUSION

For the reasons above, Plaintiffs' motion seeking final approval of this proposed settlement and dismissing this case with prejudice should be granted.

Dated:  October 14, 2011                    Respectfully submitted,

                                            */s/ Joseph F. Roda*
                                            Joseph F. Roda

                                            */s/ Dianne M. Nast*
                                            Dianne M. Nast

                                            Jennifer S. Snyder
                                            RODANAST, PC
                                            801 Estelle Drive
                                            Lancaster, Pennsylvania 17601
                                            (717) 892-3000

                                            *Lead Counsel for Direct Purchaser*
                                            *Class Plaintiffs*

Michael L. Roberts
ROBERTS LAW FIRM, PA
P.O. Box 241790
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575


Arnold Levin
Fredrick S. Longer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
(215) 592-1500

J. Douglas Richards
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street
14th Floor
New York, NY 10005
(212) 838-7797


Paul E. Slater
SPERLING & SLATER, PC
55 W. Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 641-3200

Daniel E. Gustafson
Karla M. Gluek
GUSTAFSON GLUEK PLLC
650 Northstar East,
608 2nd Avenue S.
Minneapolis, MN 55402
(612) 333-8844

Linda P. Nussbaum
Shelly Friedland
John D. Radice
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
(646) 722-8500


Daniel Berger
Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3026


Joseph M. Vanek

VANEK, VICKERS, & MASINI P.C.
111 S. Wacker, Suite 4050
Chicago, Illinois 60606
(312) 224-1500

*Co-Counsel for Direct Purchaser Class Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that the foregoing Plaintiffs' Motion for Final Approval of Direct Purchaser Class Settlement and supporting memorandum were served via ECF upon all counsel of record on this 14th day of October, 2011.

*/s/ Joseph F. Roda*
Joseph F. Roda
RODANAST, P.C.
801 Estelle Drive
Lancaster, Pennsylvania 17601
Telephone:  (717) 892-3000
Facsimile:  (717) 892-1200