## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
|  | : |  |
| In re:  WELLBUTRIN SR | : | CIVIL ACTION NO. 04-5525 |
| ANTITRUST LITIGATION | : |  |

## CLASS COUNSEL'S MOTION FOR
## ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES,
## AND CLASS REPRESENTATIVE AWARDS

Based upon the facts and authority in their accompanying Memorandum of Law,

Lead Class Counsel,[1] along with the other counsel representing the class (collectively "Class

Counsel"), respectfully move this Court under Rules 23(h) and 54(d)(2) of the Federal Rules of

Civil Procedure for:

- an award of attorneys' fees in the amount of one-third (33⅓%) of the $49 million

  settlement fund and accrued interest;

- reimbursement of the $1,610,516.02 in expenses that they advanced on behalf of

  Plaintiffs[2] and the class; and

- awards of $25,000 each for named Plaintiffs SAJ and Meijer for their efforts on

  behalf of the class.

---

[1]  By Memorandum and Order of May 2, 2008 (Doc. 158), Judge Kauffman appointed Dianne M. Nast, Esquire and Roda Nast, P.C. as Lead Class Counsel for the direct purchaser class (at p.26).

[2]  "Plaintiffs," as used herein, refers to (1) SAJ Distributors, Inc. and Stephen L. LaFrance Holdings, Inc. (together, "SAJ") and (2) Meijer, Inc. and Meijer Distribution, Inc. (together, "Meijer").

Dated:  October 14, 2011

Respectfully submitted,

*/s/ Joseph F. Roda*
Joseph F. Roda

*/s/ Dianne M. Nast*
Dianne M. Nast

Jennifer S. Snyder
RODANAST, PC
801 Estelle Drive
Lancaster, Pennsylvania 17601
(717) 892-3000

*Lead Counsel for Direct Purchaser
Class Plaintiffs*

Michael L. Roberts
ROBERTS LAW FIRM, PA
P.O. Box 241790
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575

Arnold Levin
Fredrick S. Longer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
(215) 592-1500

J. Douglas Richards
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street
14th Floor
New York, NY 10005
(212) 838-7797

Paul E. Slater
SPERLING & SLATER, PC
55 W. Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 641-3200

Daniel E. Gustafson
Karla M. Gluek
GUSTAFSON GLUEK PLLC
650 Northstar East,
608 2nd Avenue S.
Minneapolis, MN 55402
(612) 333-8844

Linda P. Nussbaum
Shelly Friedland
John D. Radice
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
(646) 722-8500

Daniel Berger
Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3026

Joseph M. Vanek
VANEK, VICKERS, & MASINI P.C.
111 S. Wacker, Suite 4050
Chicago, Illinois 60606
(312) 224-1500

*Co-Counsel for Direct Purchaser Class Plaintiffs*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
|  | : |  |
| In re:  WELLBUTRIN SR | : | CIVIL ACTION NO. 04-5525 |
| ANTITRUST LITIGATION | : |  |

**MEMORANDUM OF LAW IN SUPPORT OF**
**CLASS COUNSEL'S MOTION FOR**
**ATTORNEYS' FEES, REIMBURSEMENT OF EXPENSES,**
**AND CLASS REPRESENTATIVE AWARDS**

**INTRODUCTION**

Lead Class Counsel,[1] along with the other counsel representing the class (collectively "Class Counsel"), respectfully submit this memorandum in support of their request under Rules 23(h) and 54(d)(2) of the Federal Rules of Civil Procedure for an award of attorneys' fees and reimbursement of expenses from the settlement that they have achieved for Plaintiffs[2] and the direct purchaser class.[3]  In addition, Class Counsel seek awards to Plaintiffs SAJ and Meijer in recognition of their investment of time and resources in representing the class, without which this settlement would not have occurred.

---

[1]  By Memorandum and Order of May 2, 2008 (Doc. 158), Judge Kauffman appointed Dianne M. Nast, Esquire and Roda Nast, P.C. as Lead Class Counsel for the direct purchaser class (at p.26).

[2]  "Plaintiffs," as used herein, refers to (1) SAJ Distributors, Inc. and Stephen L. LaFrance Holdings, Inc. (together, "SAJ") and (2) Meijer, Inc. and Meijer Distribution, Inc. (together, "Meijer").

[3]  By Memorandum and Order of May 2, 2008 (Doc. 258), Judge Kauffman certified the following class:  "all persons or entities in the United States, excluding governmental entities, that purchased the 100mg or 150mg dosage of Wellbutrin SR directly from GSK during the period from January 24, 2002 to June 30, 2006."

As detailed below, Class Counsel request a fee calculated under the appropriate method, the percentage-of-the-fund method, and in a percentage that falls directly on the median for class action settlements, one-third (33⅓%) of the $49 million settlement fund and accrued interest. The percentage fee requested is justified by the complexity of this case, the time that Class Counsel have devoted to it—while shouldering all of the attendant risks—for over seven years (including pre-filing investigation), the excellent result that Class Counsel obtained, and all other factors that the Third Circuit has established for determining the reasonableness of a fee award. One of those factors, the lodestar "cross-check," underscores the reasonableness of Class Counsel's request:  Class Counsel's lodestar, whether calculated in accordance with accepted practice at current rates ($19,616,951) or even at historic rates ($16,530,110), exceeds the percentage fee requested ($16,333,333).

This is a class action pharmaceutical antitrust case, a difficult and highly specialized area of law.  Class Counsel practice primarily on a contingency basis, and not every case is successful.  An award of attorneys' fees based on a fair percentage of the settlement fund is necessary to promote enforcement of the nation's antitrust laws, as well as to compensate Class Counsel for the risk taken and the reward obtained for the class.

Class Counsel also request reimbursement of $1.3 million in out-of-pocket expenses advanced on behalf of the class, as well as awards of $25,000 each to Plaintiffs SAJ and Meijer, whose participation in this case enabled the $49 million recovery on behalf of the class to occur.

## I.     THIS WAS A DIFFICULT AND COMPLEX CASE THAT HAD TO BE DEVELOPED VIRTUALLY FROM SCRATCH.

As this Court can attest from presiding over the case and the many motions that the Court considered, this case involved novel and complicated questions of law, as well as challenging issues of proof, all of which made this case particularly difficult.

By contrast with straight-forward horizontal price-fixing litigation, which frequently is pursued on the heels of federal antitrust indictments and guilty pleas, there was no governmental investigation or federal indictment concerning Wellbutrin SR.  This case, by contrast with those alleging conspiracies, focused on unilateral action by Defendant SmithKline Beecham Corporation d/b/a GlaxoSmithKline ("GSK").  It also involved liability theories based on allegations that GSK both defrauded the U.S. Patent and Trademark Office and filed sham lawsuits against its competitors, which presented far more difficult legal issues than those in a classic price-fixing case.

Yet despite these obstacles, Class Counsel have obtained a settlement for the class of $49 million in cash, plus the payment by GSK of up to $500,000 for the costs of providing notice of the settlement to the class and administering the settlement.  This settlement represents a recovery of between 5.8% and 10.7% of Plaintiffs' estimated damages, well within the range of recovery that other courts have found to be fair, reasonable, and adequate.  *See* Plaintiffs' Motion for Final Approval of Direct Purchaser Class Settlement and supporting materials.

From the outset, the case had substantial risk, more than in many other antitrust cases.[4] This risk came from factors including:

- the difficulties incident to initiating an antitrust case that did not follow upon a governmental action.  As noted above, many private antitrust cases arise after a federal investigation has uncovered wrongdoing and the FTC has filed complaints.[5] Such was not the case here.

---

[4]  The efforts of Class Counsel in achieving this result are summarized below, and are submitted based on the record, as well as the undersigned counsel's personal knowledge of the case.

[5]  *See, e.g., In re Lorazepam & Clorazepate Antitrust Litig.*, 289 F.3d 98 (D.C. Cir. 2002)

- the difficulties of demonstrating—by clear and convincing evidence—that GSK's patent infringement lawsuits not only had no realistic expectation of success (i.e., were objectively baseless), but were also filed with the subjective intent of interfering with GSK's competition in the market for Wellbutrin SR. *See Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.,* 508 U.S. 49, 60-61 (1993) ("*PRE*") (setting forth the standard for proving sham litigation).

- the implications—for purposes of Plaintiffs' sham litigation claims—of the record in GSK's underlying patent infringement lawsuit against Eon, *Glaxo Wellcome Inc. v. EON Labs. Mfg., Inc.,* No. 1:00-cv-09089-LMM (S.D.N.Y), in which Judge McKenna:

    o   denied Eon's motion for summary judgment on non-infringement of GSK's '798 patent and affirmed that denial on reconsideration,

    o   extended a temporary restraining order (initially granted by Judge Leisure) multiple times,

    o   granted a preliminary injunction against Eon and denied Eon's request to stay that injunction, and

    o   made certain comments on the record, which GSK argued in the present case were evidence that its case against Eon was not objectively baseless.

- The difficulties of proving—also by clear and convincing evidence—that GSK had defrauded the Patent Office under the standard of *Walker Process Equip., Inc. v.*

---

and *FTC v. Mylan Labs., Inc.,* 62 F. Supp. 2d 25 (D.D.C. 1999) (federal antitrust charges regarding Lorazepam and Clorazepate).

*Food Mach. & Chem. Corp.*, 382 U.S. 172 (1965)[6]—a hurdle that the Court decided, on summary judgment, Plaintiffs could not overcome.

- The possibility of adverse rulings on GSK's second motion for reconsideration of summary judgment, which had been argued, but was undecided at the time the parties reached a settlement, and on which a ruling in GSK's favor would have ended Plaintiffs' case.

- The risk that the Court might rule against Plaintiffs on the several *Daubert* motions that GSK had filed to preclude the testimony of Plaintiffs' experts, or on GSK's unresolved motions *in limine,* or on Plaintiffs' motions *in limine*—a risk that was significant, given that, by the time of settlement, the Court had ruled against Plaintiffs on four of the pretrial motions that Plaintiffs had filed.

- The risk that the Court might grant GSK's motion to try the market phase of the case first, which would have forced Plaintiffs to present their case, in effect, backwards, and in a way that would have prevented the jury's hearing the full story of the case in a single trial, in the most comprehensible way.

- The difficulties of proof that Plaintiffs faced based on the fact that many—if not most—of the documents perhaps most relevant to establishing their claims were withheld by GSK on its claims that the documents were protected by the attorney-client privilege and/or work product doctrine.

---

[6] To establish fraud on the PTO (i.e., "*Walker Process* fraud"), a plaintiff must demonstrate, by clear and convincing evidence:  (1) the misrepresentation or omission of a material fact; (2) the intent to deceive or at least a state of mind so reckless as to the consequences that it is the equivalent of intent; (3) reliance on the misrepresentation; and (4) injury.  *See Unitherm Food Sys., Inc. v. Swift-Eckrich, Inc.,* 375 F.3d 1341, 1358 (Fed. Cir. 2004), *rev'd on other grounds,* 546 U.S. 394 (2006).

In fighting to overcome these risks, Class Counsel devoted more than 41,000 hours, over more than seven years (including pre-filing investigation), with some Class Counsel working on the case for significant periods to the exclusion of everything else.[7]  In addition to this investment of time, Class Counsel also invested more than $1.3 million in out-of-pocket expenses, with no guarantee of return, to retain leading experts in chemistry, FDA regulations, economics, and patents, as well as to cover other reasonable and necessary litigation expenses (such as for court reporting, videography, photocopying, teleconferencing, travel, and computerized legal research).[8]

### A.    Detailed History of the Case

Plaintiff SAJ filed the first complaint in this case on November 30, 2004 (Doc. 1), followed by the complaint of Plaintiff Meijer.  The case was initially assigned to the Honorable Bruce R. Kauffman, who presided over it until retiring from the bench in July 2009.

Before filing their complaints, Class Counsel did an extensive investigation of the two GSK patents at issue (the '798 and '994 patents) and GSK's patent infringement cases against the five manufacturers who sought to market generic versions of Wellbutrin SR (Eon, Impax, Watson, Andrx, and Excel).

SAJ moved early on, in December 2004, to certify the direct purchaser class (Doc. 8), but that motion was put on hold in early 2005, to address other matters in the case, including the

---

[7]  Individual declarations of each Class Counsel firm that substantially participated in this litigation are submitted, as Exhibits 1 through 10, in support of Class Counsel's request for fees and reimbursement of expenses.  Each declaration attests to that individual firm's common benefit time and expenses.

[8]  *See* Exhibits 1 through 10.  Class Counsel have limited their request for reimbursement of expenses to $1.3 million, in accordance with the notice provided to the class.

provisions for a master (consolidated, amended) complaint and a protective order for discovery (*see* Docs. 15, 16, 18, 20).

Three months later, in March 2005, GSK moved to dismiss the case (Doc. 23).  Plaintiffs opposed GSK's motion (Doc. 25), GSK replied (Doc. 26), the Court held oral argument (*see* Docs. 31, 34), and in March 2006, the Court denied GSK's motion to dismiss Plaintiffs' sham litigation claim, but granted GSK's motion to dismiss Plaintiffs' *Walker Process* claim, without prejudice to Plaintiffs' filing an amended complaint for the latter claim (Doc. 36).

As a harbinger of things to come, GSK did not readily accept the Court's denial of its motion to dismiss the sham litigation claim.  It sought certification of the Court's order for interlocutory appeal (Doc. 38), which Plaintiffs opposed (Doc. 44).  Plaintiffs also filed a master complaint, amending and re-pleading the *Walker Process* allegations (Doc. 42).  In May 2006, the Court denied GSK's motion to certify for interlocutory appeal (Doc. 48), and GSK then answered the master complaint (Doc. 49).

In mid-2006, Plaintiffs returned to class certification, filing a supplemental brief in support of their earlier motion (Doc. 58)—which GSK opposed (Doc. 74)—and then a reply brief (Doc. 77).  Plaintiffs prevailed on this:  after additional supplemental briefing by both parties (*see* Docs. 132-34, 142, 145, 157), the Court certified the direct purchaser class in May 2008 and appointed Lead Class Counsel (Doc. 158).  Plaintiffs then moved to give notice of class certification to members of the direct purchaser class, the Court approved the forms and manner of notice, and Plaintiffs gave notice to class members in the summer of 2008 (*see* Docs 160-62, 189).

While Plaintiffs' motion for class certification was briefed and pending, the parties actively engaged in discovery.  In the summer of 2006, Class Counsel worked with Plaintiffs

7

SAJ and Meijer to obtain documents responsive to GSK's discovery requests, and, in autumn 2006, corporate representatives of Plaintiffs (assisted by Class Counsel) prepared for and gave depositions.

The parties each also served and responded to interrogatories, which on Plaintiffs' side required the participation and assistance of Plaintiffs SAJ and Meijer.

In 2006 and 2007, Plaintiffs sought document discovery from GSK, and over the course of the case, Plaintiffs ultimately obtained, analyzed, and catalogued for future use in the case more than one million pages of documents, including complex patent documents and scientific materials.

Between January 2007 and May 2008, Class Counsel prepared for and took the depositions of twenty-three GSK fact and 30(b)(6) witnesses, and, in September and October 2008, prepared for and took the depositions of GSK's six expert witnesses. Class Counsel likewise prepared for and defended the depositions of its six expert witnesses, one of whom (Plaintiffs' expert economist) was deposed multiple times, as well as certain experts for the indirect purchaser plaintiffs, who were cross-designated in the direct purchasers' case.

In addition, the parties engaged in discovery of the third party manufacturers that sought to market generic versions of Wellbutrin SR. The third parties opposed this discovery at varying levels, with Plaintiffs being forced to pursue discovery as to one third party (Eon's successor, Sandoz) in the District of New Jersey, given the limited power to subpoena that entity in this jurisdiction.

The parties also engaged in extensive motion practice on discovery, much of which centered on GSK's claims that thousands of relevant documents were protected from discovery under the attorney-client privilege and/or work product doctrine (*see, e.g.,* Docs. 79-81, 88-93,

8

96-97, 99-100, 107-08, 112, 115-16, 120).  These motions were necessarily preceded by meet-and-confer sessions, during which the parties debated their respective positions.

The Court referred the parties' discovery motions to Magistrate Judge Hart (Doc. 98), who held oral argument on several of the early motions on July 24, 2007 (Doc. 113), and then, after supplemental briefing by the parties and *in camera* review of certain GSK documents (*see* Docs. 136, 140-41, 143), granted some motions in favor of Plaintiffs and some in favor of GSK (*see* Docs. 121, 144).  Plaintiffs then filed, and the parties briefed, several additional discovery motions (*see* Docs. 147-48, 150, 153-54, 163-64, 169, 171, 177, 179, 180, 182-83, 185), which Judge Hart denied in April (Doc. 156) and September (Doc. 184) of 2008.

In October 2008, GSK filed its initial motions for summary judgment, one on "all claims" (Doc. 195) and one on just the '994 patent (i.e., the *Walker Process* claim) (Doc. 197).  Plaintiffs opposed both motions (*see* Docs. 206-07) and GSK filed reply memoranda (Docs. 218-19). While the motions were pending, Judge Kauffman retired from the bench in the second half of 2009, and the case, along with its nearly five years of history, was reassigned to the Honorable Lawrence F. Stengel (Doc. 232).

After an initial conference with the parties in late 2009 (*see* Docs. 233, 238), the Court ruled on GSK's summary judgment motions, denying the motion on "all claims" (Doc. 248), but granting the motion on the '994 patent / *Walker Process* claim (Doc. 247).  In response, GSK filed both a motion for reconsideration of the Court's order denying its motion for summary judgment on "all claims" (and, alternatively, for certification for interlocutory appeal) (Doc. 251) and a renewed motion for summary judgment on "all claims" (Doc. 252), both of which Plaintiffs opposed (Docs. 254, 258).  After additional briefing by both parties (*see* Docs. 259, 260, 262-264), the Court denied both of GSK's motions (Docs. 267-70, 273).

The parties then filed opposing briefs on scheduling the balance of the case (*see* Docs. 274, 277, 278, 280), with Plaintiffs seeking an aggressive schedule towards trial.  After a status conference (*see* Docs. 282-83, 286), the Court set a schedule in January 2011 for the remainder of the case, with trial to begin on June 27, 2011 and numerous filing deadlines before then (Doc. 289).

Over roughly the next two months, the parties collectively filed and briefed twenty pre-trial motions, including *Daubert* motions, motions *in limine,* and a motion (by GSK) to bifurcate the trial by trying the market phase first (Docs. 290-91, 295, 299, 302-09, 311-20, 327-53, 356-63).  In addition to these motions, Plaintiffs had previously filed a motion *in limine* regarding certain evidence concerning generic manufacturer Eon (Doc. 165) and a motion seeking to preclude GSK from making certain references to counsel (Doc. 181), the latter of which the Court denied without prejudice to Plaintiffs' refiling it later (Doc. 240), which Plaintiffs did in February 2011 (Doc. 303).  GSK had also earlier filed, and Plaintiffs had opposed, a *Daubert* motion seeking to preclude certain testimony of two of Plaintiffs' experts (*see* Docs. 199, 205, 220, 223, 225, 234, 235-237, 243), which the Court granted in part and denied in part (Doc. 249).  These pretrial motions—like the summary judgment motions—involved complex legal issues pertaining to antitrust law, various patent law doctrines, difficult evidentiary matters, and sham litigation.

While the parties pursued their pretrial motions, in February 2011, GSK moved for leave to file another motion for reconsideration of the Court's order denying GSK's motion for summary judgment on "all claims" (Doc. 310), which was followed by extensive briefing by both parties (*see* Docs. 326, 354-55, 364-65, 374).

It was at this time that the prospect of a settlement began to mount.  With the Court's

encouragement, the parties explored the possibility of settlement in a private, day-long mediation session on April 1, 2011 with Boston University Law School Professor Eric D. Green, a well-recognized and accomplished mediator.  *See In re Am. Investors Life Ins. Co. Annuity Mktg. & Sales Practices Litig.*, 263 F.R.D. 226, 230 (E.D. Pa. 2009) (McLaughlin, J.) (acknowledging Professor Green's experience).  That session, however, ended with the parties far apart, and preparation for trial continued.

On May 2, 2011, the Court heard oral argument on some of the parties' pending motions (*see* Doc. 370, 393) and thereafter granted GSK leave to move (for a second time) for reconsideration of its order denying summary judgment on "all claims" (Doc. 375).  GSK so moved, and the parties fully briefed the issues (Docs. 380, 391-92).

About the same time, the parties also prepared and filed their respective pretrial memoranda, responses to legal issues raised by the opposing party, proposed jury instructions, proposed verdict slips, and proposed *voir dire* (Docs. 376-79, 381-87), engaged in meet-and-confer sessions on issues such as the admissibility of exhibits and stipulations, and exchanged deposition designations and counter-designations.

Due to the number of pretrial motions at issue, and GSK's motion for reconsideration of summary judgment, the Court held a follow-up hearing on May 25, 2011, to hear additional oral argument on issues to be decided before trial.  During that hearing, the parties agreed, at the Court's urging, to return to private mediation.

On June 7, 2011, the parties returned to mediation before Professor Green, and at this session reached a settlement, which was memorialized that day in a memorandum of principle, and then in the Settlement Agreement that was executed on August 3, 2011, filed with the Court

on August 17, 2011 (Doc. 405), and preliminarily approved on August 31, 2011 (Doc. 407) after a hearing (*see* Doc. 406).

Since then, Class Counsel have continued to work on claims issues, prepare the materials necessary for consideration of final approval, coordinate with the Claims Administrator, and respond to class members' inquiries.

## II.  CLASS COUNSEL ARE ENTITLED TO COMPENSATION BASED ON THE BENEFITS CREATED BY THE LITIGATION.

Under well-established law, Class Counsel are entitled to compensation based upon the benefits that their efforts over more than seven years have created for the class.  Under equally well-established law, the compensation that Class Counsel request is reasonable and should be awarded.

### A.  Class Counsel Have Created a Common Fund From Which Class Counsel Should Be Compensated.

For more than a century, the Supreme Court has "recognized consistently that a litigant or a lawyer who recovers a common fund for the benefit of persons other than himself or his client is entitled to a reasonable attorney's fee from the fund as a whole."  *Boeing Co. v. Van Gemert*, 444 U.S. 472, 478 (1980).  *See also Boone v. City of Philadelphia*, 668 F. Supp. 2d 693, 713 (E.D. Pa. 2009) (McLaughlin, J.) (citing *Boeing*, 444 U.S. at 478); *In re Ikon Office Solutions, Inc. Sec. Litig.*, 194 F.R.D. 166, 192 (E.D. Pa. 2000) (Katz, J.) ("[T]here is no doubt that attorneys may properly be given a portion of the Settlement Fund in recognition of the benefit they have bestowed on class members.").

The common fund doctrine is based upon the inherent equitable powers of the federal courts to "prevent . . . inequity by assessing attorney's fees against the entire fund, thus spreading fees proportionately among those benefited by the suit."  *Boeing*, 444 U.S. at 478.  In contrast to

a case in which fees are assessed pursuant to a statute, fees in a common fund case "are not assessed against the unsuccessful litigant (fee shifting), but rather are taken from the fund or damage recovery (fee spreading), thereby avoiding the unjust enrichment of those who otherwise would be benefited by the fund without sharing in the expenses incurred by the successful litigant." *Flickering v. C.I. Planning Corp.*, 646 F. Supp. 622, 632 (E.D. Pa. 1986) (Shapiro, J.).

Class Counsel have created such a common fund in this case for the direct purchaser class in the amount of $49 million, are thus entitled to compensation from that fund, and have asked for compensation consistent with the approved approach in this Circuit for determining that compensation.

> **B.     Courts in the Third Circuit Apply the "Percentage-of-the-Fund" Method for Calculating Attorneys' Fees in Common Fund Cases.**

The Third Circuit favors the percentage-of-recovery method of calculating fee awards in common fund cases. *In re AT&T Corp.*, 455 F.3d 160, 164 (3d Cir. 2006); *In re Rite Aid Corp. Sec. Litig.*, 396 F.3d 294, 300 (3d Cir. 2005). This is because it allows courts to award fees in a way that rewards success and penalizes failure. *Rite Aid*, 396 F.3d at 300 (citing *In re Prudential Ins. Co. of America Sales Practices Litig.*, 148 F.3d 283, 333 (3d Cir. 1998)).[9]

---

[9]   The alternative method of awarding attorneys' fees, the lodestar method (which is used here as a "cross-check" and is described in greater detail below), "is more commonly applied in statutory fee-shifting cases, and is designed to reward counsel for undertaking socially beneficial litigation in cases where the expected relief has a small enough monetary value that a percentage-of-recovery method would provide inadequate compensation." *Prudential*, 148 at 333.

For a history of the Third Circuit's approach to awarding attorneys' fees, including a discussion of the Report of the Third Circuit Task Force, *Court Awarded Attorney Fees,* 108 F.R.D. 237 (1985) ("1985 Task Force Report") and the transition to the prevailing view that the percentage-of-the-fund method is preferred in common fund cases, see *In re Cendant Corp. Litig.*, 264 F.3d 201, 255-57 (3d Cir. 2001). As noted in *Rite Aid,* 396 F.3d at 306 n.16, a second Task Force was convened and issued a follow-up report in 2002. That report likewise endorsed

"Under the percentage-of-recovery approach, a court charged with determining whether a particular fee is 'reasonable' first calculates the percentage of the total recovery that the proposal would allocate to attorneys fees by dividing the amount of the requested fee by the total amount paid out by the defendant; it then inquires whether that percentage is appropriate based on the circumstances of the case." *Cendant*, 264 F.3d at 256.

Some courts within this jurisdiction have awarded attorneys' fees from the gross amount of the settlement fund. *See, e.g., In re Methyl Methacrylate (MMA) Antitrust Litig.*, 06-MD-1768, 2009 WL 3150399, at *2 (E.D. Pa. Sept. 23, 2009) (Savage, J.) (awarding fees of $4,545,000, representing 30% of the gross settlement fund of $15,150,000); *In re Auto. Refinishing Paint Antitrust Litig.*, MDL No. 1426, 2008 WL 63269, at *3, 8 (E.D. Pa. Jan. 3, 2008) (Surrick, J.) (awarding fees of $13 million, representing 33⅓% of the $39 million settlement fund).  As noted below (*see* pp.28-29, *infra*), courts in other jurisdictions have routinely awarded fees from the gross settlement fund in other pharmaceutical antitrust class actions similar to this one.

Other courts, by contrast, have awarded fees against the net settlement fund, after the deduction of litigation costs (including taxes).  *See, e.g., Bradburn Parent Teacher Store, Inc. v. 3M (Minnesota Mining & Mfg. Co.)*, 513 F. Supp. 2d 322, 337 (E.D. Pa. 2007) (Padova, J.); *In re In re Aetna Inc.*, Civ. A. MDL 1219, 2001 WL 20928, at *14 (E.D. Pa. Jan. 4, 2001) (Padova, J.).  Courts favoring the latter approach have reasoned that it gives counsel the incentive to be efficient and keep costs to a minimum, and thereby reduces the burden on the court of evaluating the reasonableness of the costs incurred.  *See Lachance v. Harrington*, 965 F. Supp. 630, 647-48

---

use of the percentage-of-the-fund method in common fund cases.  *See* Report of the Third Circuit Task Force, *Selection of Class Counsel,* 208 F.R.D. 340, 421-24 (2002).

(E.D. Pa. 1997) (Yohn, J.) (acknowledging that "most courts seem to apply the POR [percentage-of-recovery] methodology to the gross settlement fund," but nonetheless electing to use the net approach for the policy reasons stated above).

The Third Circuit has not yet addressed which approach should be followed. *Fanning v. Acromed Corp.*, No. 1014, 2000 WL 1622741, at *5 & *5 n.13 (E.D. Pa. Oct. 23, 2000) (Bechtle, J.) (awarding fees based on the gross settlement fund).

Class Counsel respectfully request that fees in this case be calculated on the gross settlement fund. The costs for which Class Counsel seek reimbursement are at a very reasonable level, especially given the number of years throughout which this case was litigated. Indeed, as discussed below, the costs requested in this case are comparable to or less than costs in other antitrust cases that were resolved in far fewer years.

In addition to being the preferred method of determining fees in common fund cases, generally, the percentage-of-the-fund method has also been used consistently in pharmaceutical antitrust class action settlements in the Third Circuit and elsewhere. *See, e.g.*:

- *Stop & Shop Supermarket Co. v. SmithKline Beecham Corp.*, Civ. A. 03-4578, 2005 WL 1213926, at *8 (E.D. Pa. May 19, 2005) (Padova, J.) (direct purchaser case involving the drug Paxil and its generic equivalents, holding that the court would use the percentage of recovery method for assessing the attorneys' fees request, recognizing that it is the method generally favored in common fund cases);

- *Nichols v. SmithKline Beecham Corp.*, Civ. A. 00-6222, 2005 WL 950616, at *20 (E.D. Pa. Apr. 22, 2005) (Padova, J.) (indirect purchaser Paxil case reaching the same conclusion as *Stop & Shop*);

- *In re Remeron Direct Purchaser Antitrust Litig.*, Civ. 03-0085 FSH, 2005 WL 3008808, at *12 (D.N.J. Nov. 9, 2005) (Hochberg, J.) (direct purchaser action concluding that "the percentage of fund method is the proper method for compensating Plaintiffs' Counsel in this common fund case");

15

- *In re Remeron End-Payor Antitrust Litig.*, Civ. 02-2007 FSH, 2005 WL 2230314, at *26 (D.N.J. Sept. 13, 2005) (Hochberg, J.) (indirect purchaser action reaching the same conclusion as in the related direct purchaser *Remeron* litigation);

- *In re Warfarin Sodium Antitrust Litig.*, 212 F.R.D. 231, 261 (D. Del. 2002) (Robinson, C.J.) ("In determining the fee award in a common-fund class action, the Third Circuit follows the percentage-of-the-recovery method.");

- *In re Relafen Antitrust Litig.*, 231 F.R.D. 52, 79 (D. Mass. 2005) ("[T]his Court rules that the percentage of fund method is appropriate in these circumstances.");

- *In re Cardizem CD Antitrust Litig.*, 218 F.R.D. 508, 531 (E.D. Mich. 2003) ("[T]he percentage-of-the-fund method is the proper method for compensating Plaintiffs' Counsel[.]"); and

- *In re Lorazepam & Clorazepate Antitrust Litig.*, 205 F.R.D. 369, 383 (D.D.C. 2002) (applying the percentage-of-the fund method and noting that the D.C. Circuit has joined other circuits in concluding that that the percentage method is the appropriate one to use in common fund cases).

### C.     The Percentage That Class Counsel Request Is Fair and Reasonable.

The Third Circuit has historically instructed courts to consider the following seven

"*Gunter*" factors when evaluating the reasonableness of a fee request under the percentage-of-

recovery method:

> (1) the size of the fund created and the number of persons benefitted; (2) the presence or absence of substantial objections by members of the class to the settlement terms and/or fees requested by counsel; (3) the skill and efficiency of the attorneys involved; (4) the complexity and duration of the litigation; (5) the risk of nonpayment; (6) the amount of time devoted to the case by plaintiffs' counsel; and (7) the awards in similar cases.

*Gunter v. Ridgewood Energy Corp.*, 223 F.3d 190, 195 n.1 (3d Cir. 2000).  Because each case is

different, and the relevance of these factors may vary with context, the factors "need not be

applied in a formulaic way."  *Id.  See also Rite Aid*, 396 F.3d at 303 ("We have generally

cautioned against overly formulaic approaches in assessing and determining the amounts and

reasonableness of attorneys' fees.").

16

Thus, even if one factor disfavors a requested fee award, other factors may outweigh that one. *See, e.g., Meijer, Inc. v. 3M*, Civ.A. 04-5871, 2006 WL 2382718, at *22 (E.D. Pa. Aug. 14, 2006) (Padova, J.) (holding that although the time devoted to the litigation was relatively low as a result of the case settling after roughly one year, this was outweighed by more important *Gunter* considerations).

More recently, and because the *Gunter* factors are neither universally relevant nor exhaustive in all cases, the Third Circuit has suggested that it also may be important to consider the following factors from its decision in *Prudential* (as well as such other factors that a particular case may warrant):

> (1) the value of benefits accruing to class members attributable to the efforts of class counsel as opposed to the efforts of other groups, such as government agencies conducting investigations, *Prudential,* 148 F.3d at 338; (2) the percentage fee that would have been negotiated had the case been subject to a private contingent fee agreement at the time counsel was retained, *id.* at 340; and (3) any "innovative" terms of settlement, *id.* at 339.

*AT&T Corp.*, 455 F.3d at 165-66 ("In reviewing an attorneys' fees award in a class action settlement, a district court should consider the *Gunter* factors, the *Prudential* factors, and any other factors that are useful and relevant with respect to the particular facts of the case.").

District courts have substantial discretion in awarding fees, and their awards will not be overturned absent an abuse of that discretion (such as a failure to follow the proper legal standard or procedures, or basing an award on clearly erroneous facts, or failing to explain the rationale underlying its decision). *Rite Aid*, 396 F.3d at 299.[10]

---

[10] The proposed order submitted herewith addresses both this motion and Plaintiffs' Motion for Final Approval of Direct Purchaser Class Settlement. A combined order has been submitted both for efficiency (as the motions and relevant legal standards involve overlapping issues) and consistent with the Settlement Agreement (previously submitted as Exhibit 1 to Plaintiffs' Motion for Preliminary Approval of Direct Purchaser Class Settlement), which requires (at ¶ 4) that Plaintiffs seek "an" order and final judgment containing certain terms, some

In this case, the pertinent *Gunter* and *Prudential* factors support the fee requested.

### The *Gunter* Factors

**1.      The complexity and duration of the litigation.**

The Third Circuit has said that the fourth *Gunter* factor—the complexity and duration of the litigation—is "the first factor that a district court can and should consider in awarding fees." *Gunter*, 223 F.3d at 197.  *See also Am. Investors*, 263 F.R.D. at 243.

Antitrust cases top the list in terms of complexity.  *See Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 338-39 ("[A]ntitrust class actions are perhaps the most complex cases to litigate."); *In re Linerboard Antitrust Litig.,* 296 F. Supp. 2d 568, 577 (E.D. Pa. 2003) (DuBois, J.) ("An antitrust class action is arguably the most complex action to prosecute.") (citation omitted).  *See also Auto. Refinishing Paint*, 2008 WL 63269, at *5 (observing that most antitrust cases are "exceedingly complex, expensive, and lengthy").  This case involved multifaceted antitrust, patent, and evidentiary, issues, the complexity of which is demonstrated by the various dispositive, discovery, and pretrial motions that were filed in this case.

---

of which concern final approval and others of which concern attorneys' fees, reimbursement of costs, and awards to the class representative Plaintiffs.

The proposed order contains detailed findings and case law citations in recognition of the requirement that district courts must make findings on each of the relevant factors pertinent to these motions.  *See Rite Aid*, 396 F.3d at 301 ("Notwithstanding our deferential standard of review of fee determinations, we have required district courts to clearly set forth their reasoning for fee awards so that we will have a sufficient basis to review for abuse of discretion."); *In re Pet Food Products Liab. Litig.*, 629 F.3d 333, 350 (3d Cir. 2010) (In considering motions for final approval of class action settlements, "district courts must make findings as to each of the *Girsh* factors, and the *Prudential* factors where appropriate . . . [and] cannot substitute the parties' assurances or conclusory statements for its independent analysis of the settlement terms.").  It is not, however, the intention of Plaintiffs or Class Counsel to substitute their conclusions for the independent analysis of the Court or to otherwise intrude on the province of the Court.

This antitrust case also had "duration."  Class Counsel invested more than seven years (including pre-filing investigation) preparing and litigating this case, as detailed above.

Its complexity and duration thus weigh in favor of the fee award requested.  *See Am. Investors*, 263 F.R.D. at 243 (where a case involved complex RICO allegations, had been pending for more than five years, and class counsel had conducted extensive discovery, retained experts, and filed and defended several complex motions, this supported counsel's fee request); *Boone*, 668 F. Supp. 2d at 714 (where class counsel spent four years litigating a difficult case involving a complicated issue of constitutional law, this weighed in favor of awarding the requested attorneys' fees); *Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 339 (where an antitrust case was filed more than four years before settlement; involved litigation over class certification and collateral estoppel, expert testimony on both class certification and on the merits, and numerous depositions; and was ready for trial, this factor weighed in support of the fee request); *In re Corel Corp. Inc. Sec. Litig.*, 293 F. Supp. 2d 484, 496 (E.D. Pa. 2003) (Brody, J.) (finding this factor supported awarding counsel's requested fees where the action involved complex issues of federal securities laws and was zealously litigated for more than three years, involving numerous motions, success in obtaining class certification and defending it on appeal, and intensive discovery).

### 2.       The size of the fund and the number of people benefited.

The settlement in this case provides an excellent benefit to the class:  an immediate and certain payment of $49 million in cash, plus accrued interest, less attorneys' fees, expenses (to the extent not covered by the $500,000 that GSK has agreed to pay towards the costs of administering the settlement), and awards to the named Plaintiffs, as may be awarded by the Court.

This sizeable settlement, moreover, will be divided among a limited, national class of direct purchasers.  Their *certain* recovery compares reasonably to the *potential* damages that they might have recovered at trial, when the risks of trial are taken into account.  According to an analysis performed by Plaintiffs' economic expert, Gary French, Ph.D., the $49 million settlement recovers between 5.8% and 10.7% of the estimated single damages in this case, depending on how many manufacturers of generic Wellbutrin SR would have entered the market and when.  As discussed in Plaintiffs' Motion for Final Approval of Direct Purchaser Class Settlement and supporting materials, which Plaintiffs incorporate by reference, this settlement is well within the range of recovery that other courts have found to be fair, reasonable, and adequate.

### 3.    The presence or absence of objections to terms or fees.

To date, there have been no objections to the request for attorneys' fees.[11]  The detailed notice that was individually mailed to class members, the summary notice that was published twice in *The Pink Sheet,* and the materials available on the website dedicated to this settlement (www.WellbutrinDirectPurchaserSettlement.com) all put class members on notice of (1) the terms of the settlement, (2) where additional information could be obtained, (3) that Class Counsel intended to seek attorneys' fees of up to one-third of the net settlement fund (as well as litigation costs not to exceed $1.3 million and class representative awards of $25,000 each), and (4) how to object to any aspect of the settlement, including the attorneys' fees petition.

---

[11]  The postmark deadline to object to the settlement or any of its terms, including the petition for attorneys' fees, is November 4, 2011.  Should any objections be received by that deadline, Class Counsel will timely respond to those objections by the deadline of November 14, 2011.

The fact that no class member has objected to the settlement terms or the proposed fee request weighs in favor of awarding the requested fees. *See In re Sterling Fin. Corp. Sec. Class Action*, MDL 1879, 2009 WL 2914363, at *2 (E.D. Pa. Sept. 10, 2009) (Stengel, J.) (where there where only two objections to the fee request, this factor weighed strongly in favor of approving the requested fee award); *Boone*, 668 F. Supp. 2d at 713 (where there were only three objections to the settlement and just one to the proposed attorneys' fees and costs, this weighed in favor of approving the requested fees and costs); *Auto. Refinishing Paint*, 2008 WL 63269, at *4 ("A lack of objections demonstrates that the Class views the settlement as a success and finds the request for counsel fees to be reasonable."); *In re Linerboard Antitrust Litig.*, MDL 1261, 2004 WL 1221350, at *5 (E.D. Pa. June 2, 2004) (DuBois, J.) ("The absence of objections supports approval of the Fee Petition.").

Courts have found a low number of objectors to be particularly telling in cases—such as this one—that involve sophisticated class members. *See, e.g., Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 338 ("The absence of objections to the requested attorneys' fees in this case is particularly notable given the sophisticated nature of the absent Class Members."); *Linerboard*, 2004 WL 1221350, at *5 ("While in some cases a lack of objections may reflect the absence of counsel or unfamiliarity with the legal system, in this case class members are represented by counsel . . . [and] include many of the largest corporations in America—entities that are hardly unfamiliar with civil litigation.").[12]

---

[12] Even if objections are made, that does not necessarily mean that the requested fee should be reduced in response.  Unsubstantiated objections, for example, would not warrant a reduction in counsel's fee request.  *See Am. Investors*, 263 F.R.D. at 244.  *See also Corel Corp.*, 293 F. Supp. 2d at 496 (refusing to "infer too much" from the fact that some class members objected).

Here, moreover, not only have there been no objections to date, but the three largest

pharmaceutical distributors in the country have all submitted letters endorsing not only the

settlement, but also Class Counsel's motion for attorneys' fees, reimbursement of costs, and

awards to the named Plaintiffs.  *See* Exhibits 3-5 to the Memorandum of Law in Support of

Plaintiffs' Motion for Final Approval of Direct Purchaser Class Settlement (letter of October 3,

2011 from McKesson Corporation, letter of September 27, 2011 from counsel for

AmerisourceBergen Co., and letter of September 27, 2011 from counsel for Cardinal Health).[13]

These letters explain that these three companies will make the largest claims for recovery from

the settlement in this case, and that each company—having been informed of the facts,

circumstances, legal hurdles, and other risks involved in this case—supports the proposed

settlement as "fair and adequate" and agrees that the fees sought by Class Counsel are

"appropriate" and "justified by the time and expense" spent prosecuting and favorably resolving

this case.  That these class members—whose claims (including those of their subsidiaries)

collectively represent roughly 78% of the total recovery—have voiced such support is further

evidence of the reasonableness of Class Counsel's fee request.

### 4.      The skill and efficiency of counsel.

Class Counsel's practices emphasize complex antitrust class actions.[14]  Within that

already limited field, their firms are part of an even smaller group that practices in the risky area

of pharmaceutical antitrust class action cases.  Their experience in similar litigation reflects Class

---

[13]  Although each of these letters is addressed to the Court, the letters were provided to
Class Counsel for filing and were not separately mailed to the Court.

[14] Class Counsel respectfully refer the Court to the biographies that have been submitted
with their declarations.  *See* Exhibits 1 through 10.

Counsel's skill and efficiency, as does the result obtained for the class.  *See Linerboard*, 2004 WL 1221350, at *5 ("The result achieved is the clearest reflection of petitioners' skill and expertise.").  Class Counsel also faced formidable opposition from defense counsel, whose firm is recognized as among the foremost in the nation, and who fought this case with tenacity throughout.

This factor thus also supports Class Counsel's fee request.  *See Am. Investors*, 263 F.R.D. at 244 (where class counsel were highly skilled in litigating class actions against insurance companies, the defendants were represented by a leading law firm, and the case was vigorously litigated by both sides, this supported class counsel's fee request); *Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 338 (where class counsel were experienced in complex class litigation and obtained a significant settlement for the class, despite the complexity and challenges of the case, this supported the fee request); *Corel Corp.*, 293 F. Supp. 2d at 496 (where counsel primarily practiced in the field of shareholder securities litigation, had considerable experience, and faced formidable legal opposition, this supported awarding the requested fees).

### 5.	The risk of nonpayment.

"A determination of a fair fee must include consideration of the sometimes undesirable characteristics of a contingent antitrust action[], including the uncertain nature of the fee, the wholly contingent outlay of large out-of-pocket sums by plaintiffs, and the fact that the risk of failure and nonpayment in an antitrust case are extremely high."  *Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *14.

This was an extremely complex case, which involved not only difficult legal issues, but also significant costs and the substantial risk of nonpayment.  Class Counsel had to be prepared to front all of those costs and carry all the risk that there might not be any recovery.  The risk

faced by Class Counsel was multifaceted, as there was risk involved with: (a) building a case from the ground up without a solid federal government case for a foundation; (b) defeating GSK's motion to dismiss and pursuit of certification of the Court's order for interlocutory appeal; (c) obtaining class certification; (d) surviving summary judgment—the risk of which is evidenced by the fact that GSK prevailed on one of its summary judgment motions, although it did not end the case; (e) surviving GSK's renewed motion for summary judgment and multiple motions for reconsideration (the second of which remained pending at the time of settlement); (f) defeating GSK's pretrial motions (including motions *in limine, Daubert* motions, and a motion to bifurcate, all of which—except for two motions that Plaintiffs did not oppose and were thus denied as moot—remained pending at the time of settlement); and—if the case had continued— (g) ultimately proving liability and damages at trial; and (h) surviving any appeals.

Enveloping all of these risks was the substantial exposure that Class Counsel faced in handling the case on a contingent basis. *See Ikon Office Solutions*, 194 F.R.D. at 194 ("[T]here are inherent, substantial risks entailed in undertaking any contingency fee action."). Unlike the highly skilled counsel representing GSK, Class Counsel get paid only if they win, and if they do get paid, it is often only after years of work without payment. As one court recently observed, attorneys who undertake the representation of a class are "unable to mitigate any of the risk of nonpayment; instead, they [a]re required to spend or incur obligations to effectively litigate th[e] case." *Serrano v. Sterling Testing Sys., Inc.*, 711 F. Supp. 2d 402, 423 (E.D. Pa. 2010) (Pratter, J.). This risk was shouldered entirely by Class Counsel; "the Class itself risked nothing out-of-pocket." *Id.*

The substantial risk of nonpayment that Class Counsel faced throughout this litigation further supports their fee request. *See Am. Investors*, 263 F.R.D. at 244 (fee request was

reasonable in light of this factor where counsel represented the class on a contingency basis in a complex case for more than five years and advanced hundreds of thousands of dollars without any guarantee of payment); *Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 339 (where counsel took a case involving substantial risks of establishing both liability of damages on a wholly contingent basis, this factor weighed in favor of a finding that the requested fee was appropriate); *Auto. Refinishing Paint,* 2008 WL 63269, at *5 (where counsel pursued an antitrust case on a contingency basis, without the benefit of *prima facie* liability having been established by the government in a criminal action, the risk of nonpayment was considerable and supported approval of the fee request).

### 6.      The amount of time devoted to the litigation.

As noted above, this case required a substantial investment of time.  Counsel spent more than 41,000 hours over the course of more than seven years, preparing, litigating, and negotiating the settlement of this case.

Further, Class Counsel's commitment to this litigation is far from over.  Counsel will spend substantial additional time preparing for and participating in the final approval hearing, and handling claims administration, not to mention handling any appeal if one is brought.  Class Counsel's lodestar calculations (discussed below) do not include any amount for this substantial future work.  *See Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *15 (observing that class counsel would "likely incur hundreds of additional hours in connection with administering the settlement, without the prospect for further fees").  That Class Counsel's fee request covers not only work that has been done to date (excluding time spent on this fee petition), but also any such future work, makes the requested fee that much more reasonable.

While Class Counsel have devoted significant time to this litigation, they staffed this case leanly and appropriately. When suitable, Counsel assigned associate attorneys to the case, as well as paralegals, who have substantially lower hourly rates than senior shareholders and partners. These staffing decisions demonstrate an appropriate allocation of resources.

The time that Class Counsel have devoted to this litigation thus also supports approval of their fee request. *See Boone*, 668 F. Supp. 2d at 714 (where class counsel spent roughly 2,858 hours of contingent work on the litigation, this justified their fee request); *Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 339 (where class counsel spent more than four years, including more than 9,000 attorney hours and roughly 2,000 paralegal hours, on the case, this weighed in favor of awarding the requested fees); *Nichols*, 2005 WL 950616, at *22 (where class counsel had devoted more than 17,000 hours of work to the litigation, this factor weighed in favor of awarding the requested fees).

### 7. The consistency with fee awards in comparable cases.

"A study referenced by another court in this district analyzed 289 class action settlements ranging from under $1 million to $50 million and determined that the average attorneys' fees percentage to be 31.71% and the median to be one-third." *Boone*, 668 F. Supp. 2d at 714 (citing *In re Rite Aid Corp. Secs. Litig.,* 146 F. Supp. 2d 706, 735 (E.D. Pa. 2001) (Dalzell, J.)). *See also* 4 Herbert B. Newberg & Alba Conte, *Newberg on Class Actions* § 14:6 (4th ed. 2006) ("In the normal range of common fund recoveries in . . . antitrust suits, common fee awards fall in the 20 to 33 per cent range.").[15] *See also Rite Aid,* 396 F.3d at 303; *Cullen v. Whitman Medical*

---

[15] This settlement is distinguishable from those that courts have termed "megafund" settlements, in which the recovery approaches or exceeds $100 million. *See Manual for Complex Litigation, Fourth,* § 14.121 (2004), at 188-89, available at: https://public.resource.org/scribd/8763868.pdf. *See also Sterling Fin. Corp.*, 2009 WL 2914363, at *4 (observing that $100 million seems to be the informal marker of a "very large"—i.e.,

*Corp.*, 197 F.R.D. 136, 150 (E.D. Pa. 2000) (Brody, J.) (noting that an "award of one-third of the fund for attorneys' fees is consistent with fee awards in a number of recent decisions within this district").

Class Counsel's fee request is thus well within the accepted range for class action settlements, and is lower than awards that have been approved in some cases (*see, e.g., Bradburn,* in the chart below). A sample of recent antitrust cases with settlements in the $15 million to $75 million range further demonstrates that the requested award of one-third (33⅓%) is within the range of awards approved in other cases within the Third Circuit:

| CASE (LISTED IN REVERSE CHRONOLOGICAL ORDER) | SETTLEMENT AMOUNT | FEE AWARD AS PERCENTAGE OF SETTLEMENT AMOUNT |
|---|---|---|
| *MMA*, 2009 WL 3150399, at *2 (Savage, J.) (approving attorneys' fees in a direct purchaser antitrust action lasting roughly three years) | $15.15 million | 30% |

megafund—settlement). The percentage of the fund that is approved for attorneys' fees in megafund cases is often lower than in non-megafund cases. *See, e.g., Am. Investors*, 263 F.R.D. at 244 (discussing a compilation of fees granted in insurance sales practices cases, which ranged from 6.5% to 14.5% of settlement funds ranging from $90.1 million to $1.8 billion).

Even in megafund cases, however, the Third Circuit has approved a higher percentage, *see AT&T Corp.,* 455 F.3d at 167-70 (affirming award of 21.25% of a settlement fund valued at approximately $100 million), as have district courts in this jurisdiction. *See Linerboard*, 2004 WL 1221350, at *16-17 (awarding fees of 30% of a roughly $202 million settlement fund and declining to reduce the percentage even though the case involved a megafund settlement); *Ikon Office Solutions*, 194 F.R.D. at 196 (approving a fee award of 28.4% of a $111 million settlement and refusing to reduce the amount despite that the settlement was in the megafund range).

| | | |
|---|---|---|
| *Auto. Refinishing Paint*, 2008 WL 63269, at *3, 6 (Surrick, J.) (awarding attorneys' fees for prosecution of antitrust case for roughly three-and-a-half years) | $39 million | 33⅓% |
| *Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 337-38, 341-42 (Padova, J.) (awarding attorneys' fees in antitrust action litigated for nearly four years) | $38.73 million[16] | 35% |
| *Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *12, 17 (Hochberg, J.) (awarding attorneys' fees in a direct purchaser pharmaceutical antitrust action, which settled after three years of litigation) | $75 million | 33⅓% |
| *Nichols*, 2005 WL 950616, at *20, 24 (Padova, J.) (awarding attorneys' fees an in indirect purchaser pharmaceutical antitrust action that settled after nearly four-and-a-half years of litigation) | $65 million | 30% |

*See also In re Tricor Direct Purchaser Antitrust Litig.,* No. 05-340-SLR (D. Del. Apr. 23, 2009) (Robinson, J.) (awarding 33⅓% of $250 million megafund settlement) (attached as Exhibit 11); *In re Gen. Instrument Sec. Litig.*, 209 F. Supp. 2d 423, 435 (E.D. Pa. 2001) (Reed, J.) (approving award of 33⅓% of a $48 million settlement in a securities class action).

Moreover, one-third of the gross settlement fund has frequently been awarded by courts in other jurisdictions in similar pharmaceutical antitrust actions, further demonstrating the appropriateness of Class Counsel's fee request.  *See, e.g.*:

- *Meijer, Inc. v. Abbott Labs.,* No C. 07-5985 CW (N.D. Cal. Aug. 11, 2011) (awarding 33⅓% of $52 million settlement) (attached as Exhibit 12);

---

[16]  As noted above, by contrast with the other cases in this chart, the fees in *Bradburn* were based on the net settlement fund (i.e., the gross settlement fund of $39,750,000, after deduction of expenses of $1,011,375).

- *In re Nifedipine Antitrust Litig.*, No. 03-mc-223-RJL (D.D.C. Jan. 31, 2011) (awarding 33⅓% of $35 million settlement) (attached as Exhibit 13);

- *In re Oxycontin Antitrust Litig.*, 04-md-1603-SHS (S.D.N.Y. Jan. 25, 2011) (awarding 33⅓% of $16 million settlement) (attached as Exhibit 14);

- *Meijer, Inc. v. Barr Pharm., Inc.*, C.A. No. 05-2195 (D.D.C. Apr. 20, 2009) (awarding 33⅓% of $22 million settlement) (attached as Exhibit 15);

- *North Shore Hematology-Oncology Assoc., P.C. v. Bristol-Myers Squibb Co.*, No. 04-248-EGS (D.D.C. Nov. 30, 2004) (awarding 33⅓% of $50 million settlement) (attached as Exhibit 16);

- *In re Relafen Antitrust Litig.*, No. 01-12239-WHY at 7-8 (D. Mass. Apr. 9, 2004) (awarding 33⅓% of $175 million settlement fund) (attached as Exhibit 17).

### The *Prudential* Factors

**8.      The value of benefits accruing to class members attributable to the efforts of class counsel, as opposed to the efforts of others.**

As discussed above, the development of this case depended entirely on the investigation and efforts of Class Counsel and, unlike many antitrust cases, did not follow on the heels of a government lawsuit (or even investigation).  This factor thus likewise supports Class Counsel's fee request.  *See AT&T Corp.*, 455 F.3d at 173 (where class counsel was not aided by the efforts of any governmental group, this strengthened the district court's conclusion that the fee award was fair and reasonable).

**9.      The percentage fee that would have been privately negotiated.**

A one-third contingency is standard in individual litigation (and could be even higher in antitrust cases, given the complexities and risks involved).  *See Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 340 (holding that a fee award of 35% of the net settlement fund was comparable to the percentage counsel would have negotiated had the case been subject to a private contingency fee agreement when counsel was retained); *Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *16 (observing that "[a]ttorneys regularly contract for

29

contingent fees between 30% and 40% with their clients in non-class, commercial litigation" and

holding, in the context of a direct purchaser pharmaceutical antitrust class action, that the

"requested 33⅓% fee reflects the market rate in other litigation of this type").  That the fees

requested here are comparable to those that Class Counsel could have negotiated in the

marketplace thus also supports the reasonableness of the fee request.

### 10.    Innovative settlement terms.

Because the terms of this settlement—while providing an excellent benefit to the class—

are otherwise relatively standard, this final factor neither supports nor detracts from Class

Counsel's fee request.  *See Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 340 (where the

settlement did not contain any particularly innovative terms, this did not adversely affect

counsel's fee request).

### D.    A Lodestar Cross-Check Confirms the Reasonableness of the Fee Request.

The Third Circuit has held that it is "sensible" for district courts to perform a lodestar

cross-check to ensure that application of the percentage method does not result in a recovery that

is too great.  *Rite Aid,* 396 F. 3d at 305-06.  *See also Boone*, 668 F. Supp. 2d at 713 (Courts in the

Third Circuit "use the alternative method of fee calculation, the lodestar method, as a cross-

check in order to ensure that the fee amount is reasonable.").

The lodestar is calculated by multiplying the number of hours reasonably worked on a

case by the reasonable hourly billing rates for those services.  *See Rite Aid,* 396 F. 3d at 305.

The billing rates to be used in calculating the lodestar should be "blended" ones, of all who

worked on the case, and not the billing rates of just the most senior attorneys.  *Id.* at 306.  Courts

within this jurisdiction commonly calculate the lodestar using current rates (rather than

"historical" ones, i.e., the rates that applied during different periods in the case).  *See, e.g.,*

*Bradburn Parent Teacher Store,* 513 F. Supp. 2d at 341; *Meijer*, 2006 WL 2382718, at *24; *Ikon Office Solutions*, 194 F.R.D. at 195.  *See also Petruzzi's Inc. v. Darling-Delaware Co., Inc.*, 983 F. Supp. 595, 607 (M.D. Pa. 1996) (Vanaski, J.) ("It is . . . appropriate to calculate the lodestar based upon current rates to compensate for the fact that services have been rendered over an 11 year period.").

When used as a cross-check, the lodestar analysis may be abridged and requires "neither mathematical precision nor bean counting." *Rite Aid,* 396 F. 3d at 305-06.  District courts may rely on summaries from counsel and need not review actual billing records.  *Id.* at 306-07.

In the end, the lodestar cross-check is just that—a safeguard; it "does not trump the primary reliance on the percentage of common fund method." *Id.* at 307.

Class Counsel in this case have gone a step beyond the requirements of *Rite Aid,* using not just "blended" rates, which average the rates of all attorneys and paralegals who worked on the case, but the actual rates of each attorney and paralegal, thereby providing a more accurate accounting of what would have been billed had the case been pursued on an hourly fee basis. *See Nichols*, 2005 WL 950616, at *24 (lodestar calculated at actual billing rates).  The hourly rates charged by Class Counsel and their support staff are consistent with rates that Class Counsel have been awarded in other cases.

Using Class Counsel's reasonable, actual, current rates, the lodestar totals $19,616,951, which is substantially *more than* the percentage fee ($16,333,333) that Class Counsel have requested.  The percentage fee Class Counsel request thus has a *negative* multiplier.  This confirms the reasonableness of the fee request, especially when considered against multipliers approved in other cases—including some that were found to *lack* complexity or that settled without the protracted and hard-fought litigation that this case required.  *See, e.g.*:

- *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 741-42 (3d Cir. 2001) (suggesting that a lodestar multiplier of 3 would be appropriate on remand, even though the Third Circuit found the case was lacking in legal and factual complexity, and—in this pre-*Rite Aid* case—the lodestar was calculated using the senior partner rate as the rate for all hours);

- *Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 341 (approving a fee award resulting in a lodestar multiplier of 2.5 at counsel's then-current rates in a case litigated for nearly four years);

- *Nichols*, 2005 WL 950616, at *24 (awarding fees as a percentage of the fund that translated to a 3.15 multiplier in a case that lasted roughly four-and-a-half years);

- *Ikon Office Solutions*, 194 F.R.D. at 195 (conducting a lodestar cross-check of the percentage fee award and finding a 2.7 multiplier, calculated at counsel's then-current rates, to be well within an appropriate range in a case lasting roughly one-and-a-half years);

- *Meijer*, 2006 WL 2382718, at *21, 24 (approving a percentage fee award that translated to a 4.77 multiplier in a case that settled after roughly one year).

Indeed, even if Class Counsel's lodestar were calculated at historic rates, it would be $16,530,110, and thus still exceed the percentage fee that Class Counsel request. The lodestar cross-check thus confirms that the percentage fee that Class Counsel seek is appropriate.

### III.  REIMBURSEMENT OF LITIGATION EXPENSES FROM THE SETTLEMENT FUND IS APPROPRIATE.

It is well-established that attorneys who create a common fund for the benefit of a class are entitled to reimbursement from that fund of the reasonable litigation expenses they advanced on behalf of the class. *See Cendant Corp. PRIDES Litig.*, 243 F.3d at 732 n.12 (quoting the 1985 Task Force Report for the conclusion that the "common-fund doctrine . . . allows a person who maintains a lawsuit that results in the creation, preservation, or increase of a fund in which others have a common interest, to be reimbursed from that fund for litigation expenses incurred."); *Ikon Office Solutions,* 194 F.R.D. at 192 (observing that there is "no doubt" that attorneys who create a common fund for the benefit of a class are entitled to reimbursement of reasonable

32

litigation expenses from that fund) (citation omitted).  *See also AT&T Corp.*, 455 F.3d at 172 n.8

(observing that litigation "[e]xpenses are generally considered and reimbursed separately from

attorneys' fees).

Class Counsel request reimbursement of $1.3 million in out-of-pocket expenses.  A large

component of this amount consists of fees paid to experts and consultants who were instrumental

in, among other things, helping Plaintiffs evaluate the case and prepare it for trial.  These

expenses, as well as others routinely charged to hourly-fee-paying clients, such as deposition

expenses, photocopying charges, computerized legal research costs, and travel expenses, were

reasonable and appropriate.

Moreover, Class Counsel's request for reimbursement of expenses is supported by the

three class members whose claims represent the vast majority of the settlement fund.  *See*

Exhibits 3-5 to the Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of

Direct Purchaser Class Settlement.

In addition, although each case is unique, the expenses sought in this case are roughly

comparable to (and in some cases significantly less than) those reimbursed in other antitrust

litigation within the Third Circuit, including cases that were litigated for far less time.  *See, e.g.,*

*MMA*, 2009 WL 3150399, at *2 (awarding reimbursement of roughly $1.3 million in expenses

incurred over roughly three years); *Auto. Refinishing Paint*, 2008 WL 63269, at *6 (expenses of

roughly $1.2 million incurred over approximately three-and-a-half years); *Remeron Direct*

*Purchaser Antitrust Litig.*, 2005 WL 3008808, at *17 (awarding reimbursement of $1.925

million in expenses incurred during roughly three years).  By the time of the final approval

hearing, this case, by contrast, will have lasted nearly seven years since filing (and considerably

longer if Class Counsel's pre-filing investigation is included).

33

In light of the efficiency with which Class Counsel managed the costs in this lengthy litigation, Class Counsel respectfully submit that this is not a case in which the policy rationale for deducting costs from the settlement fund before awarding attorneys' fees applies. *See Lachance*, 965 F. Supp. at 647-48 (discussing rationale behind deducting costs first of incentivizing counsel to efficiently manage litigation costs, which may then inure to the benefit of the court in reviewing costs). In this case, where no such incentive was needed, deducting costs before awarding fees would serve only as a penalty.

Moreover, as noted above, even *Lachance* acknowledges that most courts award fees from the gross settlement fund, *see id.* at 647, and many courts within this jurisdiction have continued to do so in the years since *Lachance* was decided. *See, e.g., MMA*, 2009 WL 3150399, at *2; *Auto. Refinishing Paint*, 2008 WL 63269, at *3, 8; *Fanning,* 2000 WL 1622741, at *5.

## IV.  AWARDS TO THE CLASS REPRESENTATIVE PLAINTIFFS ARE APPROPRIATE.

Awards to class representative plaintiffs for their efforts in bringing and prosecuting the case are common in class action litigation, particularly where, as in this case, a common fund has been created for the benefit of the entire class. *See Cullen*, 197 F.R.D. at 145. Indeed, courts routinely approve awards to class representatives for the services they provided and the risks they undertook in pursuing a case, placing the interests of the class above their own. *Id. See also Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 342 ("It is particularly appropriate to compensate named representative plaintiffs with incentive awards when they have actively assisted plaintiffs' counsel in their prosecution of the litigation for the benefit of the class."); *Auto. Refinishing Paint*, 2008 WL 63269, at *7 ("Incentive awards are typically awarded to class representatives for their often extensive involvement with a lawsuit and courts in this Circuit have traditionally granted requests for these awards.").

Plaintiffs SAJ and Meijer each actively assisted in the preparation and prosecution of this case, including by assisting in the pre-filing investigation, reviewing draft complaints, collecting and producing documents, preparing for and giving depositions, and preparing to participate in what could have been a several-week trial.  Without these efforts, members of the class would not have recovered anything.  In recognition of their work as class representatives, Class Counsel request that the Court approve awards in the amount of $25,000 each to SAJ and Meijer.

The requested awards are well within the acceptable range awarded by courts within the Third Circuit in other recent direct purchaser antitrust litigation.  *See, e.g.*:

- *Bradburn Parent Teacher Store*, 513 F. Supp. 2d at 342 (awarding $75,000 to the named plaintiff, which worked with class counsel through four years of investigation, prosecution, and settlement, including giving nine depositions, testifying at the class certification hearing, and preparing to attend and testify at trial);

- *Auto. Refinishing Paint,* 2008 WL 63269, at *7 (approving awards to four class representatives resulting in aggregate awards of $30,000 each, where the class representatives spent significant time assisting counsel and litigating the case, resulting in benefits to all class members);

- *Remeron Direct Purchaser Antitrust Litig.*, 2005 WL 3008808, at *18 (awarding a total of $60,000 to be divided between the two named plaintiffs for their efforts in behalf of the class); and

- *Linerboard*, 2004 WL 1221350, at *18-19 (awarding $25,000 each to five class representatives, who conferred benefits on the class in providing verified interrogatory answers, producing documents, preparing for and giving depositions, and participating in initial mediation sessions).

*See also In re Cardizem CD Antitrust Litig.*, 218 F.R.D. at 535-36 (awarding $75,000 each to the corporate class representatives); *McCoy v. Health Net, Inc.*, 569 F. Supp. 2d 448, 479-80 (D.N.J. 2008) (ERISA action approving awards of $60,000 each to the named plaintiffs and citing cases approving named plaintiff awards ranging from $35,000 to $200,000 each).

The requested awards, like Class Counsel's requests for attorneys' fees and reimbursement of expenses advanced on behalf of the class, are also supported by the three class

members whose claims represent the vast majority of the settlement fund.  *See* Exhibits 3-5 to

the Memorandum of Law in Support of Plaintiffs' Motion for Final Approval of Direct Purchaser

Class Settlement.

## CONCLUSION

Without any guarantee of success or repayment, Class Counsel pursued this litigation at

their own risk and expense, and in return, they seek reasonable fees of one-third of the $49

million settlement fund ($16,333,333) (plus accrued interest from the date of deposit of the funds

at the same rate earned by the funds) and reimbursement of $1.3 million in expenses that they

advanced on behalf of Plaintiffs and the class.  Class Counsel also request that named Plaintiffs

SAJ and Meijer be awarded $25,000 each for their efforts in prosecuting this case to a successful

resolution on behalf of the direct purchaser class.

Dated:  October 14, 2011                       Respectfully submitted,

                                               */s/ Joseph F. Roda*
                                               Joseph F. Roda

                                               */s/ Dianne M. Nast*
                                               Dianne M. Nast

                                               Jennifer S. Snyder
                                               RODANAST, PC
                                               801 Estelle Drive
                                               Lancaster, Pennsylvania 17601
                                               (717) 892-3000

                                               *Lead Counsel for Direct Purchaser*
                                               *Class Plaintiffs*

Michael L. Roberts
ROBERTS LAW FIRM, PA
P.O. Box 241790
20 Rahling Circle
Little Rock, Arkansas 72223
(501) 821-5575

Arnold Levin
Fredrick S. Longer
LEVIN, FISHBEIN, SEDRAN & BERMAN
510 Walnut Street, Suite 500
Philadelphia, Pennsylvania 19106
(215) 592-1500

J. Douglas Richards
COHEN MILSTEIN SELLERS & TOLL PLLC
88 Pine Street
14th Floor
New York, NY 10005
(212) 838-7797

Paul E. Slater
SPERLING & SLATER, PC
55 W. Monroe Street, Suite 3300
Chicago, Illinois 60603
(312) 641-3200

Daniel E. Gustafson
Karla M. Gluek
GUSTAFSON GLUEK PLLC
650 Northstar East,
608 2nd Avenue S.
Minneapolis, MN 55402
(612) 333-8844

Linda P. Nussbaum
Shelly Friedland
John D. Radice
GRANT & EISENHOFER P.A.
485 Lexington Avenue
New York, NY 10017
(646) 722-8500

Daniel Berger
Eric L. Cramer
BERGER & MONTAGUE, P.C.
1622 Locust Street
Philadelphia, Pennsylvania 19103
(215) 875-3026

Joseph M. Vanek
VANEK, VICKERS, & MASINI P.C.
111 S. Wacker, Suite 4050
Chicago, Illinois 60606
(312) 224-1500

*Co-Counsel for Direct Purchaser Class Plaintiffs*

37

## CERTIFICATE OF SERVICE

I hereby certify that the foregoing Class Counsel's Motion for Attorneys' Fees, Reimbursement of Expenses, and Class Representative Awards and supporting memorandum were served via ECF upon all counsel of record on this 14th day of October, 2011.

*/s/ Joseph F. Roda*
Joseph F. Roda
RODANAST, P.C.
801 Estelle Drive
Lancaster, Pennsylvania 17601
Telephone:  (717) 892-3000
Facsimile:  (717) 892-1200